UNITED STATES of America, Appellee,

v.

Virgil ALESSI, Defendant-Appellant.

Nos. 1197, 1198, Dockets 76–1189, 76–3025.

United States Court of Appeals, Second Circuit.

Argued June 9, 1976.

Decided July 7, 1976.

Certiorari Denied Nov. 15, 1976.

See 97 S.Ct. 384.

Nancy Rosner, New York City, for appellant.

James P. Lavin, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., and Frederick T. Davis, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, FEINBERG and VAN GRAAFEILAND, Circuit Judges.

FRIENDLY, Circuit Judge.

On or about June 30, 1972, a witness disappeared. The ensuing events have come to plague the district courts for the Eastern and Southern Districts of New York and this court as well. We now have the third case this year in which this court must consider the bearing of what then happened.

The witness was a central figure in the case developed by Eastern District Strike Force Attorney James Druker to prove the allegations embodied in Eastern District indictment 72 Cr. 473. That indictment charged, among other matters, a conspiracy to violate the federal narcotics laws encompassing appellant, Virgil Alessi, and Vincent Papa, Anthony Passero, Frank D'Amato, Anthony Loria, Sr., and others; and also charged the just-named defendants with engaging in a continuing criminal enterprise as defined in 21 U.S.C. § 848. At the time of the disappearance, Druker was in the midst of plea bargaining the charges; the "package" he proposed to achieve had been written down and apparently cleared with his superiors in Washington. With his prime witness lost, Druker's case was greatly weakened, and he proceeded, over the next two months, to negotiate a bargain more favorable to the defendants. Agreement between Druker and the several attorneys who represented Vincent Papa, one of whom also represented appellant Alessi, was finally reached on August 18, 1972. No contemporaneous written evidence of the terms of the bargain exists; what they in fact were is a matter best deferred for the moment.

Sometime between August 18 and September 5, Druker learned of information that had been supplied to the Eastern District Strike Force by Joseph Ragusa, which potentially implicated Papa in yet further illegal narcotics activities. Papa was not informed of this, and ignorant of it he pleaded guilty, on September 5, 1972, to the conspiracy charge and also to a pending tax evasion information.

On October 2, 1972, Virgil Alessi waived indictment and he, too, pleaded guilty—to a

one count conspiracy charge contained in a superseding information; 72 Cr. 473 was dismissed as to him. Appellant's counsel contends that this format was used so that it would be clear that this plea acted to bar a pending prosecution in Nassau County. Appellant also waived his pre-sentence report, and was sentenced at the time of his plea. Before accepting the plea, the district court asked Alessi if anyone had promised him anything to induce it; Alessi answered that no one had. However, when the judge indicated that he would be willing to sentence Alessi to "15 years without batting an eye," it rapidly became evident that the truth was otherwise. The upshot was that, on Druker's recommendation, Alessi received a five-year suspended sentence with a mandatory three-year special parole. Appellant now claims that the consideration for his plea included certain representations by Druker, which, it is contended, prevent the prosecution in the present case from going forward.

On two previous occasions we have considered these promises of the summer of 1972. The first case, decided on April 2 of this year, was *United States v. Papa,* 533 F.2d 815, an appeal from Papa's convictions in the Southern District of New York for conspiracy to violate and a substantive violation of the narcotics laws. Papa's most important contentions were that the "Southern District conspiracy" was the same as the "Eastern District conspiracy" to which he had previously pleaded, and therefore that the Southern District prosecution on that charge was violative of his right not to be twice placed in jeopardy; and that the Southern District case, based in good part on the testimony of Joseph Ragusa, violated the bargain. This court affirmed the convictions, holding as to the first point that after all the facts were in, Papa had failed to show the claimed identity of the conspiracies; and as to the second point that even if the Eastern District U.S. Attorney's Office would have been bound not to prosecute crimes discovered by use of Ragusa's information, the bargain did not reach so far as to preclude the Southern District prosecution which had been developed entirely independently.

The second case, even more recently decided, was *United States v. Alessi,* 536 F.2d 978, (2 Cir. 1976) *(Alessi I),* which involved the same appellant as the present case. That appeal, like this one, was from a pretrial order; the challenge was to a district court decision denying Alessi's claim that the 1972 promises were broad enough to prevent an Eastern District prosecution for tax evasion during the years in which the "Eastern District conspiracy" had been in operation. This court affirmed, holding that the pre-trial order was appealable but that whatever crimes were covered by the bargain, a crime as distant from the conspiracy as tax evasion was not.

We come now to this case. By indictment filed on August 4, 1975, Anthony Passero, Lawrence Iarossi, and others were indicted by a grand jury in the Southern District of New York for conspiracy to violate the narcotics laws; Vincent Papa, Virgil Alessi, and Frank D'Amato were among the named but unindicted co-conspirators. Alessi was indicted on five substantive counts which, as supplemented by the bill of particulars, all charge him as an aider and abettor for delivering, at locations in Long Island City and other parts of Queens, various quantities of heroin to one Anthony Manfredonia, which Manfredonia then took to the Southern District for distribution to others. The Government states that if this case does finally come to trial, it will introduce evidence showing that Alessi "was well aware" that the heroin "was being transported to and concealed, possessed and distributed to others in the Southern District of New York." The Government also contends, and appellant offers nothing in refutation, that insofar as the indictment names Alessi it is based on information supplied by Manfredonia, a witness developed entirely by the Southern District, and, as Druker stated in an affidavit, unknown to him in 1972. Its brief states that "[n]o witness or evidence used in the obtaining of this indictment was obtained from prosecutors in the Eastern District." Finally, the

Government contends, although this point is indeed disputed, that Druker's representations were by their own terms not binding on the Southern District.

The essence of appellant's claim, which is based on *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), was succinctly stated by the trial court as follows:

> According to Alessi, the plea-bargain agreement provided that Alessi would not be prosecuted with respect to any overt acts committed during the course of the Eastern District conspiracy which might constitute a substantive violation of the narcotics laws. Alessi contends that the present indictment violates the plea-bargain agreement and that his prosecution would therefore amount to a denial of due process.

Trial was scheduled to begin on January 20, 1976. In November 1975, appellant moved to dismiss the indictment on the ground just indicated. Judge Bonsal, on December 29, reserved decision until the conclusion of the trial, when he would have the benefit of the evidence that had been introduced as to the true nature of the crimes charged and would conduct an evidentiary hearing. Alessi appealed, and the Government moved to dismiss the appeal. Without deciding the question of appealability, a panel of this court, on January 19, issued a writ of mandamus *(Alessi II)* directing the trial court either to sever Alessi from the trial and await its evidence, or to hold an evidentiary hearing and determine the motion prior to trial; a short unprinted opinion was filed the next day. Following issuance of the writ, also on January 19, a brief hearing was held before Judge Bonsal. Appellant's counsel urged a severance, in part on the ground that the district court should await the results of the appeal in *Papa,* which had been argued but not yet decided. Appellant also agreed to waive any claim of denial of a speedy trial that might arise out of the attendant delay.

Judge Bonsal, apparently impressed by these points and also by the fact that Alessi was not a defendant to the conspiracy count, granted the severance.

Trial as to seven of the other defendants, under the title *United States v. Iarossi,* began on January 20 and ended on February 4, with a verdict against all defendants on all counts. A notice of appeal was filed, and the case is now docketed in our court, # 76–1132, with argument presently scheduled to be heard in the middle of September.

Meanwhile the pretrial proceedings regarding defendant Alessi went on. On February 11, 1976, Judge Bonsal held another short hearing. Appellant's counsel and the prosecutor agreed that there was no further factual material to be introduced; the issue was submitted on the basis of the record developed in *Papa,* in yet another case concerning Papa and Alessi that had come before the Eastern District in October 1975, and in *Iarossi.* Four days after our decision in *Papa,* on April 6, 1976, Judge Bonsal denied the motion to dismiss the indictment. He supported his decision on two grounds: first, the conspiracy charged in the current indictment was not the same as that charged and pleaded to in the Eastern District, and therefore the substantive crimes with which Alessi was charged were not "overt acts" of that conspiracy; and second, the plea bargain was not intended to cover crimes developed by independent investigations undertaken by U.S. Attorney's Offices outside of the Eastern District. Alessi appealed from this decision on April 13, 1976.

Shortly thereafter, Alessi's trial was scheduled for May 4. On April 29, he petitioned for yet a second writ of mandamus, to halt the trial pending determination of the appeal. On May 3, a temporary stay was issued, and on May 6 a writ followed, staying the trial and setting an expedited briefing schedule. We heard oral argument on June 9.[1]

1. This case came to us docketed under the dual caption *"Virgil Alessi v. Honorable Dudley B. Bonsal"* and *"United States of America v. Virgil Alessi."* As we understand it, Alessi is presently pursuing only an appeal, and is not seeking to invoke the extraordinary writ for yet a third time; apparently the first caption is the result of the April 29 request for relief and is

## I. *Appealability*

Understandably distressed that it is now in this court for the second time, with Alessi's trial severed from that of his co-defendants and delayed for many months and with another appeal in prospect if he is tried and convicted (in which he might argue that developments at trial had demonstrated that our decision on the merits here was wrong), the Government naturally wonders how all this is consistent with *Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 84 L.Ed. 783 (1940). In an opinion by Mr. Justice Frankfurter, the Court there said among other things that Congress from the very beginning has, by forbidding "piecemeal disposition on appeal of what for practical purposes is a single controversy," "set itself against enfeebling judicial administration"; that "[t]o be effective, judicial administration must not be leaden-footed"; and that "[t]hese considerations of policy are especially compelling in the administration of criminal justice," since "encouragement of delay is fatal to the vindication of the criminal law." See also *DiBella v. United States,* 369 U.S. 121, 124, 126, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); *Kerr v. United States District Court,* 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). Alarmed at what has happened by the recent advance of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), into the criminal field under the seductive guise that a defendant is entitled under some circumstanc-

es to be protected from an unlawful trial and not simply from an unlawful conviction, and fearful that still worse may befall in the future, the Government asks that we reconsider our interpretation of the "final decision" rule of 28 U.S.C. § 1291 in *United States v. Beckerman,* 516 F.2d 905, 906–07 (2 Cir. 1975), or at least limit the damage to the precise situation there presented—a second trial admittedly for the same offense following one alleged to have been unlawfully aborted by the trial judge, and to decline to follow the recent decision on another of Alessi's due process appeals, *United States v. Alessi I, supra.* Since, as in *Beckerman* and *Alessi I,* we agree with the Government on the merits and there is a fair possibility that the issue may soon be settled, *Abney v. United States, certiorari granted,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); see also *Barket v. United States,* No. 75–1280, *petition for certiorari pending,*[2] we think it would be more useful, instead of seeking *en banc* reconsideration of *Beckerman* and/or *Alessi I,*[3] to make our own analysis but not now to challenge prior precedent in this court. Such an analysis is particularly desirable because the Government has recently called to our attention two Supreme Court decisions, *Rankin v. State,* 78 U.S. (11 Wall.) 380, 20 L.Ed. 175 (1870), and *Heike v. United States,* 217 U.S. 423, 433, 30 S.Ct. 539, 54 L.Ed. 821 (1910), seemingly favorable to it, only the latter of which it cited in *Beckerman,* and there only in summary fashion, and neither of which was cited to the

not now applicable. In any event we would decline to issue mandamus under the principle announced in *Kaufman and Withington v. Edelstein,* 539 F.2d 811, 816–817 (2 Cir. 1976).

**2.** These petitions were brought by defendants to review decisions of the Eighth Circuit in *United States v. Barket,* 530 F.2d 181 (1975), and of the Third Circuit in *United States v. Abney* (unprinted judgment order), which entertained defendants' pretrial appeals on the ground of double jeopardy but ruled for the Government on the merits. In both cases the Government has urged that the defendants' petitions be granted in order to have the Court resolve the question of appealability.

In *Beckerman* and *Alessi I* in this circuit, the Government also prevailed on the merits and therefore was not in a position to seek certiora-

ri from the ruling as to appealability. Perhaps for the same reason it did not seek consideration of the appealability issue *en banc,* as we would have to do if we followed its suggestion.

**3.** We do not agree with the statement in *Alessi I,* 536 F.2d at 980, that the appealability of an order refusing to dismiss an indictment as violating a plea bargain was "implicitly" affirmed by the first issuance of mandamus in this case. Apart from the possible effect of this court's rule § 0.23 that disposition by summary order "shall not be cited or otherwise used in unrelated cases before this or any other court," the order granting mandamus held only that Alessi was entitled to an evidentiary hearing—not that he was entitled to appeal from an adverse decision rendered thereafter.

Fourth Circuit in *United States v. Lansdown,* 460 F.2d 164 (1972), on which *Beckerman* heavily relied. On the other hand, neither party has cited more recent Supreme Court decisions which might seem to look the other way, although we conclude they in fact do not.

In *Rankin v. State, supra,* a defendant, charged with murder in the courts of Tennessee, pleaded in bar an acquittal by a general court-martial for the same crime. After the lower court had sustained the plea and entered a judgment of acquittal, the Supreme Court of Tennessee reversed and remanded for a trial on the merits. The Supreme Court dismissed the writ of error on the ground that the state court judgment was not final.[4]

Next came *Heike v. United States,* 217 U.S. 423, 30 S.Ct. 539, 54 L.Ed. 821 (1910). Charged with violations of the customs laws and with a conspiracy to defraud the United States of its revenues, Heike filed a plea in bar claiming immunity from prosecution because he had been compelled to testify on the same subject matter before a grand jury. After the trial court had directed the jury to deny the plea, it permitted Heike to plead over, and set a date for trial. A Justice of the Supreme Court allowed a writ of error to review the denial of the plea in bar, and the United States moved to dismiss the writ. The Court held the writ was not within § 5 of the Court of Appeals Act of 1891, 26 Stat. 826, 827–28, allowing direct appeal to the Supreme Court, "In any case that involves the construction or application of the Constitution of the United States." Construing this provision as embodying the final judgment rule, the Court, 217 U.S. at 429, 30 S.Ct. at 541, deemed it certain that the judgment below did "not dispose of the whole matter litigated in this proceeding . . . ." The Court continued, 217 U.S. at 430, 30 S.Ct. at 541:

> As the case now stands, upon the plea of not guilty, upon which the issue raised must be tried to a jury, certainly the whole matter has not been disposed of. It may be that upon trial the defendant will be acquitted on the merits. It may happen that for some reason the trial will never take place. In either of these events there can be no conclusive judgment against the defendant in the case. It is true that in a certain sense an order concerning a controlling question of law made in a case is, as to that question, final. Many interlocutory rulings and orders effectually dispose of some matters in controversy, but that is not the test of finality for the purposes of appeal or writ of error. The purpose of the statute is to give a review in one proceeding after final judgment of matters in controversy in any given case. Any contrary construction of the Court of Appeals Act may involve the necessity of examining successive appeals or writs of error in the same case, instead of awaiting, as has been the practice since the beginning of the Government, for one review after a final judgment, disposing of all controversies in that case between the parties.

Turning to Heike's contention that the immunity statute provided that "No person

---

4. Mr. Justice Bradley's opinion is short enough to be quoted in full:

> The difficulty with the case, as brought before us, is that the judgment was not a final one in the case. This court, under the 25th section of the Judiciary Act, can only take cognizance of final judgments of the State courts. And although the court has been liberal in its construction of the statute as to what judgments are final, yet the judgment in this case cannot be deemed such by any reasonable stretch of construction. It is a rule in criminal law *in favorem vitae,* in capital cases, that when a special plea in bar is found against the prisoner, either upon issue tried by a jury, or upon a point of law decided by the court, he shall not be concluded or convicted thereon, but shall have judgment of *respondeat ouster,* and may plead over to the felony the general issue, not guilty. And this is the effect of the judgment of reversal rendered by the Supreme Court of Tennessee in this case; so that in no sense can that judgment be deemed a final one. The case must go back and be tried upon its merits, and final judgment must be rendered before this court can take jurisdiction. If after that it should be brought here for review, we can then examine the defendant's plea and decide upon its sufficiency. Writ of error dismissed.
>
> 78 U.S. at 381–82 (footnote omitted).

shall be *prosecuted* or be subjected to any penalty or forfeiture" (emphasis supplied) and that the Government would not be keeping its promise if it proceeded beyond indictment, the Court said, 217 U.S. at 431, 30 S.Ct. at 542:

> But we are of opinion that the statute does not intend to secure to a person making such a plea immunity from prosecution, but to provide him with a shield against successful prosecution, available to him as a defense, and that when this defense is improperly overruled it may be a basis for the reversal of a final judgment against him. Such promise of immunity has not changed the Federal system of appellate procedure, which is not affected by the immunity statute, nor does the immunity operate to give a right of review upon any other than final judgments.

Still more to the point, the Court said, by way of supporting argument, 217 U.S. at 432, 30 S.Ct. at 542:

> The Constitution of the United States provides that no person shall be twice placed in jeopardy of life and limb for the same offense, yet the overruling of a plea of former conviction or acquittal has never been held, so far as we know, to give a right of review before final judgment.

The Court then went on to refer to and quote from *Rankin v. State, supra.* All this is especially significant in that the statement in *United States v. Ball* that "The prohibition [of the double jeopardy clause] is not against being twice punished, but against being twice put in jeopardy", 163 U.S. 662, 669, 16 S.Ct. 1192, 41 L.Ed. 300 (1896)—the cornerstone of our recent decision in *Beckerman* upholding review before the second trial—must have been fully as well known to the members of the *Heike* court, several of whom had participated in *Ball,* as it is to judges of the 1970's.

■ The arrival of *Cohen* on the scene would not seem, at first blush, to affect the holding or the considered dictum in *Heike.* For the cornerstone of the *Cohen* decision was that the order of the district court refusing to apply New Jersey's statute requiring security for costs in stockholders' derivative actions

> did not make any step toward final disposition of the merits of the case and will not be merged in final judgment. When that time comes, it will be too late effectively to review the present order, and the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably.

337 U.S. at 546, 69 S.Ct. at 1225. An order denying a plea of double jeopardy, or denying a claim that an indictment violates the terms of a plea bargain, *is* merged in the final judgment and can be reviewed on an appeal therefrom—except on the view that the purposes of the double jeopardy and due process clauses can only be served by preventing prosecution (beyond the stage of indictment) rather than conviction, a view rejected by *Heike* by its holding with respect to the immunity statute and by dictum with respect to double jeopardy.

The Court's first, long its only, application of *Cohen* in a criminal case, *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951), did not presage any significant impairment of the final judgment rule. The order there held to have been appealable under *Cohen* was a refusal to reduce bail pending trial. The rationale was thus explained in the concurring opinion of Mr. Justice Jackson, who should have known the meaning of *Cohen* if anyone did, 342 U.S. at 12, 72 S.Ct. at 7:

> While only a sentence constitutes a final *judgment* in a criminal case, *Berman v. United States,* 302 U.S. 211, 212, 58 S.Ct. 164, 82 L.Ed. 204, it is a final *decision* that Congress has made reviewable. 28 U.S.C. § 1291. While a final judgment always is a final decision, there are instances in which a final decision is not a final judgment. The purpose of the finality requirement is to avoid piecemeal disposition of the basic controversy in a single case "where the result of review will be 'to halt in the orderly progress of a cause and consider incidentally a question which has happened to cross the path of such litigation  .   .   ..'" *Cobble-*

dick v. United States, 309 U.S. 323, 326, 60 S.Ct. 540, 84 L.Ed. 783. But an order fixing bail can be reviewed without halting the main trial—its issues are entirely independent of the issues to be tried—and unless it can be reviewed before sentence, it never can be reviewed at all. The relation of an order fixing bail to final judgment in a criminal case is analogous to an order determining the right to security in a civil proceeding, Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, or other interlocutory orders reviewable under 28 U.S.C. § 1292.

Strain began to appear with Parr v. United States, 351 U.S. 513, 76 S.Ct. 912, 100 L.Ed. 1377 (1956). A defendant indicted for federal income tax evasion secured a transfer of his case to another division of the same district because of local prejudice. Before trial began, the Government reindicted the defendant in another district and moved to dismiss the initial indictment, which motion was granted. A bare majority of the Supreme Court held the dismissal was not appealable; any review had to await the trial and verdict on the second indictment.

Mr. Justice Harlan, writing for the Court, offered two complementary rationales. If the initial indictment was "viewed in isolation" from the second indictment, then appeal was unavailable because the defendant was not aggrieved by dismissal of the first indictment. If instead the two indictments were considered as part of the same prosecution, then the second indictment was "as it were a superseding indictment, [and] petitioner has not yet been tried, much less convicted and sentenced." 351 U.S. at 518, 76 S.Ct. at 916. Parr had not succeeded in bringing himself within the Cohen exception. The appeal did not concern matters "outside the stream of the main action," or matters which would "not be subject to effective review as part of the final judgment." The burden of a possibly needless trial was not sufficient reason for instant appealability.

True, the petitioner will have to hazard a trial under the [second] indictment before he can get a review of whether he should have been tried in Laredo under the [first] indictment, but "bearing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship." Cobbledick v. United States [309 U.S. at 325, 60 S.Ct. 540].

351 U.S. at 519–20, 76 S.Ct. at 916.

All this was in full conformity with Heike which the majority cited with approval, 351 U.S. at 517, 76 S.Ct. 912. The strain was manifested by the opinion of the Chief Justice speaking for four Justices in dissent:

We countenance plain harassment if we require Parr to be tried under what may turn out to be an invalid indictment at Austin before he can obtain appellate review of dismissal of the Laredo case. Should this occur, Parr would have been required to undergo two trials, one at Austin and another at Laredo. Section 1291 should not be construed so as to bring about such a result.

351 U.S. at 523, 76 S.Ct. at 918.

Passing the cases denying review of decisions to suppress or not to suppress evidence at trial, Carroll v. United States, 354 U.S. 394, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957), and DiBella v. United States, supra, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614, we arrive at the cryptic footnote to Mr. Justice Douglas' opinion in Brady v. Maryland, 373 U.S. 83, 85 n.1, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because of the prosecution's suppression of material favorable to the defense, the Supreme Court of Maryland had reversed the judgment convicting Brady and remanded for a new trial limited, however, to the issue of punishment. The discussion of the Supreme Court's appellate jurisdiction was as follows:

Neither party suggests that the decision below is not a "final judgment" within the meaning of 28 U.S.C. § 1257(3), and no attack on the reviewability of the lower court's judgment could be successfully maintained. For the general rule that

"Final judgment in a criminal case means sentence. The sentence is the judgment" (*Berman v. United States,* 302 U.S. 211, 212, 58 S.Ct. 164, 82 L.Ed. 204) cannot be applied here. If in fact the Fourteenth Amendment entitles petitioner to a new trial on the issue of guilt as well as punishment the ruling below has seriously prejudiced him. It is the right to a trial on the issue of guilt "that presents a serious and unsettled question" (*Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 547, 69 S.Ct. 1221, 93 L.Ed. 1528) that "is fundamental to the further conduct of the case" (*United States v. General Motors Corp.,* 323 U.S. 373, 377, 65 S.Ct. 357, 89 L.Ed. 311). This question is "independent of, and unaffected by" (*Radio Station WOW v. Johnson,* 326 U.S. 120, 126, 65 S.Ct. 1475, 89 L.Ed. 2092) what may transpire in a trial at which petitioner can receive only a life imprisonment or death sentence. It cannot be mooted by such a proceeding. See *Largent v. Texas,* 318 U.S. 418, 421–422, 63 S.Ct. 667, 87 L.Ed. 873. Cf. *Local No. 438 v. Curry,* 371 U.S. 542, 549, 83 S.Ct. 531, 9 L.Ed.2d 514.

Next came *Mills v. Alabama,* 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). Mills had been charged with violating an Alabama statute which forbade electioneering on election day, by publishing an editorial. The trial court sustained a demurrer based on First Amendment grounds, the Supreme Court of Alabama reversed and remanded for trial, and Mills appealed to the Supreme Court. Mr. Justice Black denied the State's motion to dismiss for want of a final judgment, saying, 384 U.S. at 217–18, 86 S.Ct. at 1436:

This argument has a surface plausibility, since it is true the judgment of the State Supreme Court did not literally end the case. It did, however, render a judgment binding upon the trial court that it must convict Mills under this state statute if he wrote and published the editorial. Mills concedes that he did, and he therefore has no defense in the Alabama trial court. Thus if the case goes back to the trial court, the trial, so far as this record shows, would be no more than a few formal gestures leading inexorably towards a conviction, and then another appeal to the Alabama Supreme Court for it formally to repeat its rejection of Mills' constitutional contentions whereupon the case could then once more wind its weary way back to us as a judgment unquestionably final and appealable. Such a roundabout process would not only be an inexcusable delay of the benefits Congress intended to grant by providing for appeal to this Court, but it would also result in a completely unnecessary waste of time and energy in judicial systems already troubled by delays due to congested dockets. (Footnote omitted.)

In *California v. Stewart,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), one of the four cases decided under the title of *Miranda v. Arizona,* the State had obtained certiorari from a judgment of its Supreme Court which had reversed a conviction because of the admission of a confession allegedly taken in violation of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Stewart's motion to dismiss for lack of a final judgment was denied; a footnote, 384 U.S. at 498 n.71, 86 S.Ct. at 1640, stated:

After certiorari was granted in this case, respondent moved to dismiss on the ground that there was no final judgment from which the State could appeal since the judgment below directed that he be retried. In the event respondent was successful in obtaining an acquittal on retrial, however, under California law the State would have no appeal.[5] Satisfied that in these circumstances the decision below constituted a final judgment under 28 U.S.C. § 1257(3) (1964 ed.), we denied the motion. 383 U.S. 903 [86 S.Ct. 885, 15 L.Ed.2d 661].

---

5. Hart & Wechsler, The Federal Courts and the Federal System (1973 ed.), raise the question, p. 628:

Is this not so in every criminal case in which a state appellate court orders a new trial on federal grounds?

In *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), Mr. Justice White endeavored to rationalize where these decisions and similar ones in civil cases had left the final judgment rule of 28 U.S.C. § 1257. He began with a general statement:

[A]s the cases have unfolded, the Court has recurringly encountered situations in which the highest court of a State has finally determined the federal issue present in a particular case, but in which there are further proceedings in the lower state courts to come. There are now at least four categories of such cases in which the Court has treated the decision on the federal issue as a final judgment for the purposes of 28 U.S.C. § 1257 and has taken jurisdiction without awaiting the completion of the additional proceedings anticipated in the lower state courts. In most, if not all, of the cases in these categories, these additional proceedings would not require the decision of other federal questions that might also require review by the Court at a later date, and immediate rather than delayed review would be the best way to avoid "the mischief of economic waste and of delayed justice," *Radio Station WOW, Inc. v. Johnson,* [326 U.S. 120, 65 S.Ct. 1475, at 1478, 89 L.Ed. 2092] at 124, as well as precipitate interference with state litigation.

420 U.S. at 477–78, 95 S.Ct. at 1037 (footnotes omitted). He then fitted the cases into four categories. The first category, of which *Mills* was cited as an example, consisted of cases "in which there are further proceedings—even entire trials—yet to occur in the state courts but where for one reason or another the federal issue is conclusive or the outcome of further proceedings preordained. In these circumstances, because the case is for all practical purposes concluded, the judgment of the state court on the federal issue is deemed final." 420 U.S. at 479, 95 S.Ct. at 1038. The second category, of which *Brady* was an example, consisted of cases "in which the federal issue, finally decided by the highest court in the State, will survive and require decision regardless of the outcome of future state court proceedings." 420 U.S. at 480, 95 S.Ct. at 1038. A third category, of which *Stewart* was an example, included cases "where the federal claim has been finally decided, . . . but in which later review of the federal issue cannot be had, whatever the ultimate outcome of the case. . . . [I]n these cases, if the party seeking interim review ultimately prevails [on remand] on the merits, the federal issue will be mooted; if he were to lose on the merits, however, the governing state law would not permit him again to present his federal claims for review." 420 U.S. at 481, 95 S.Ct. at 1039. The fourth category consisted of

those situations where the federal issue has been finally decided in the state courts with further proceedings pending in which the party seeking review here might prevail on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court, and where reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action rather than merely controlling the nature and character of, or determining the admissibility of evidence in, the state proceedings still to come. In these circumstances, if a refusal immediately to review the state court decision might seriously erode federal policy, the Court has entertained and decided the federal issue, which itself has been finally determined by the state courts for purposes of the state litigation.

420 U.S. at 482–83, 95 S.Ct. at 1040. It was this fourth category in which *Cox Broadcasting Corp.* apparently was deemed to fall. Finality was found not simply because "if the Georgia court erroneously upheld the statute, there should be no trial at all" but because even if the defendant prevailed at trial on non-federal grounds, "there would remain in effect the unreviewed decision of the State Supreme Court that a civil action for publishing the name of a rape victim disclosed in a public judicial proceeding may go forward despite the First and

Fourteenth Amendments." 420 U.S. at 485, 95 S.Ct. at 1041.

There is one characteristic common to all four categories of these § 1257 cases which is missing in appeals to a federal court of appeals from an order of a district court. This is that, as said in Mr. Justice White's general statement, *supra,* 420 U.S. at 477–78, 95 S.Ct. at 1037, "[i]n most, if not all, of the cases in these categories, these additional proceedings [on remand] would not require the decision of other federal questions that might also require review by the Court at a later date . . . ." In *Brady, Mills* and *Stewart,* the Supreme Court was presented with the opportunity to review, albeit at a formally interlocutory stage, the only question ever likely to be put to it, whatever the stage of the proceedings.[6] It is the one-time character of Supreme Court review of state cases that seems critical to all four of Justice White's categories. The situation is quite different with respect to federal criminal prosecutions, where the entire law defining the offense and the trial procedures is federal. If the trial occurs, it is likely that a number of "federal" questions will later be presented to the court of appeals for review—even perhaps the identical question with additional factual background—so there is not the same convenience in an appellate court's addressing any single federal question before passing upon all. Also, when acting under § 1257 with respect to cases that have been remanded for trial by a state supreme court, the Court is dealing with cases which have already passed once through the state hierarchy and can reach the Supreme Court after the remand only by again passing through a state trial court and one appellate court or often two. In contrast, dismissal of an appeal from a pretrial order of a federal district court simply means that the trial will occur and, unless the appellant wins, the court of appeals will then hear a multi-faceted appeal by him in any event. In short we conclude that the *Brady-Mills-Stewart* line of cases and their civil counterparts under 28 U.S.C. § 1257 rest on considerations peculiar to Supreme Court review of final judgments of state courts and are not authoritative on the application of *Cohen* to a court of appeals review of a pretrial order of a district court in a federal criminal case.[7] In addition to the differentiating considerations apparent in Mr. Justice White's discussion in *Cox Broadcasting Corp.* and those we have noted, a court of appeals has the opportunity of utilizing "supervisory" or "advisory" mandamus to correct any truly egregious error of a district court, see *La Buy v. Howes Leather Co., Inc.,* 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957); *Schlagenhauf v. Holder,* 379 U.S. 104, 110, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); *Kerr v. United States District Court, supra,* 426 U.S. at 402–404, 96 S.Ct. 2119, 48 L.Ed.2d 725; *American Express Warehousing, Ltd. v. Transamerica Ins. Co.,* 380 F.2d 277, 282–83 (2 Cir. 1967); *Kaufman and Withington v. Edelstein, supra* note 1, 539 F.2d at 816–817; Note, Supervisory and Advisory Mandamus under the All Writs Act, 86 Harv.L. Rev. 595 (1973).[8] This resource, usable on a

6. This clearly was true in *Brady* and *Mills*—not quite so clearly but probably true in *Stewart.*

7. In saying this we have not overlooked what might be taken as a suggestion in Mr. Justice Jackson's concurring opinion in *Stack v. Boyle, supra,* 342 U.S. at 12, 72 S.Ct. 1, that the words "final judgment" may call for more than the words "final decision." We think all the Justice was saying was that it is not fatal to an appeal under 28 U.S.C. § 1291 that a judgment is not formally final, a condition which in a criminal case would be met only by the sentence, see *Berman v. United States,* 302 U.S. 211, 212, 58 S.Ct. 164, 82 L.Ed. 204 (1937), if the other requirements of *Cohen* are satisfied. In *Parr v. United States, supra,* 351 U.S. at 518, 76 S.Ct. 912, Mr. Justice Harlan treated the two terms "judgment" and "decision" as interchangeable. As pointed out by Mr. Justice Rehnquist in his dissent in *Cox Broadcasting Corp. v. Cohn, supra,* 420 U.S. at 502–03 n.3, 95 S.Ct. 1029, statutes providing for review of decisions of federal courts had used the term "final judgment or decree" until the Evarts Act of March 3, 1891, creating the courts of appeals, 26 Stat. 826, and the legislative history affords no explanation for the Senate's changing these words, which were in the House bill, to "final decision."

8. Whether or not the All Writs statute, 28 U.S.C. § 1651, empowers the Supreme Court to issue mandamus to a state court, such power has been most sparingly used. See Hart & Wechsler, *supra,* at 298, 458.

selective basis, also dictates against broad indentation of the final decision rule, especially in criminal cases.

The decisions of the courts of appeals present a varied picture. This court's first encounter with a problem similar to that here presented was *United States v. Ford*, 237 F.2d 57, 67 (2 Cir. 1956), vacated as moot, 355 U.S. 38, 78 S.Ct. 114, 2 L.Ed.2d 71 (1957). *Ford* was a tax evasion case with separate counts for each of five years. The jury found Ford guilty for 1948, 1949 and 1950 and not guilty for 1951. It was unable to agree as to 1947; the trial judge first directed a verdict of acquittal and then vacated this. After affirming the convictions, the court dealt briefly with the claim that a retrial on the 1947 count would constitute double jeopardy. Judge Hincks, speaking also for Chief Judge Clark and Judge Frank, said, 237 F.2d at 67:

> Since the order [vacating the directed verdict of acquittal] is interlocutory and the defendant has not yet been placed in jeopardy thereunder, the issue is not currently appealable and the pending appeal as to Count 1 must accordingly be dismissed.[9]

Next came the decision of the Fifth Circuit in *Gilmore v. United States*, 264 F.2d 44, cert. denied, 359 U.S. 994, 79 S.Ct. 1126, 3 L.Ed.2d 982 (1959). There a defendant, after reversal of his conviction on a first trial, went through a second trial resulting in a hung jury, and then sought to appeal a denial of his motion for acquittal on the ground that the evidence had been insufficient for submission to the jury. The court dismissed the appeal for lack of jurisdiction. Writing for a panel that included Chief Judge Hutcheson and Judge Wisdom, Judge John R. Brown, after recounting the argument of Gilmore's counsel, which relied on

the statement in *United States v. Ball, supra,* 163 U.S. at 669, 16 S.Ct. 1192, to which we have previously referred, and commenting on the bearing of *Bryan v. United States,* 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), had this to say:

> [E]ven if it were assumed that the second trial was forbidden as double jeopardy, that does not invest us with jurisdiction to vindicate such right. The Constitution does not guarantee an appeal. That comes wholly from the statute. There are many instances in which it is ultimately determined that constitutional rights have been violated. But the nature of the asserted right, i. e., a constitutional one, does not distinguish appellate review of any such question from the assertion of other rights, whether statutory or common law, or from a procedural rule. At least so long as a criminal case is pending, review of such matters, as for example, unlawful search and seizure, unlawful arrest, unlawful detention, unlawful indictment, unlawful confession, must await the trial and its outcome. This is so even though, at the end of that trial, or an appeal from the judgment of conviction, it is ultimately determined that the violation of the constitutional right compels an acquittal. When that is the outcome, the individual accused may claim in a very real sense to have been subjected to a trial that ought never to have taken place. Congress might, as it has recently done in a very limited way for civil matters, 28 U.S.C.A. § 1292(b), provide for interlocutory appeals to test such questions prior to trial and a final judgment in the traditional sense. Until Congress does so, the individual affected is witness to the fact that, "Bearing the discomfiture and cost of a prosecution for

---

**9.** Along with the Government we are unable to agree with the statement in *United States v. Beckerman, supra,* 516 F.2d at 906, that *Ford's* "precedential authority has been undermined since the opinion was later vacated as moot" as a result of Ford's subsequent death. In so vacating a judgment the Supreme Court refrains from passing on its merits, *Durham v. United States,* 401 U.S. 481, 483 n., 91 S.Ct. 858, 28 L.Ed.2d 200 (1971) (per curiam); the

judgment loses its status as *res judicata* but not its persuasive power as a precedent in this court. We likewise fail to see the basis for the statement in *Beckerman* that the issue was "only obliquely considered" in *Ford,* although review of the briefs does indicate that the court did not have the benefit of thorough briefing, with no party discussing the possible effect of *Cohen.*

crime even by an innocent person is one of the painful obligations of citizenship." *Cobbledick v. United States,* 1940, 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783.

The Constitutional right, or the asserted violation of it, does not bridge the gap of appellate statutory jurisdiction. Nor, for like reasons, does it, through some reverse process, expand the term "final decision" into something which, contrary to a long-settled Congressional policy, amounts in actuality to piecemeal review. 264 F.2d at 46–47 (footnote omitted).

Movement in the opposite direction began with the Fourth Circuit's decision in *United States v. Lansdown, supra,* 460 F.2d 164. The case afforded about as strong an inducement for allowing appeal from an interlocutory order, under *Cohen's* exception to the finality rule, as could be imagined. The court apparently thought the Government's case had been weak and the defendant's strong and that the jury ultimately would have reached a verdict of acquittal. After having decided that the judge improperly ended the jury's long deliberations, the court considered the question of appealability and held *Cohen* to be applicable. Starting with the much quoted statement in *United States v. Ball, supra,* it reasoned, 460 F.2d at 171:

> Even if an appellate court reverses the conviction in a second trial on the grounds of double jeopardy, a defendant has still not been afforded the full protection of the fifth amendment since he has been subjected to the embarrassment, expense, anxiety and insecurity involved in the second trial. If an individual is to be provided the full protection of the double jeopardy clause, a final determination of whether jeopardy has attached to the previous trial must, where possible, be determined prior to any retrial. (Footnotes omitted).

Even so, the court added in a footnote, 460 F.2d at 171 n.8:

Our holding is limited to the narrow facts and circumstances of this case. Where the charges in the first and second trial differ and a double jeopardy argument rests on a claim that certain facts required for a conviction in the second trial were previously determined in an earlier trial, review must wait until the completion of the second trial.[10]

In addition to *United States v. Beckerman, supra,* 516 F.2d at 906–07, *Lansdown* has attracted two more adherents, *United States v. DiSilvio,* 520 F.2d 247, 248 n.2a (3 Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *United States v. Barket,* 530 F.2d 181 (8 Cir. 1975), *cert. pending,* No. 75–1280.

The Fifth Circuit, however, has remained unconvinced. *United States v. Bailey,* 512 F.2d 833 (5 Cir.), *cert. dismissed under Rule 60,* 423 U.S. 1039, 96 S.Ct. 578, 46 L.Ed.2d 415 (1975), was an appeal from denial of a motion to dismiss an indictment after a trial claimed to have been illegally aborted by the judge. Dismissing the appeal, the court repeated Judge (now Chief Judge) Brown's analysis in *Gilmore* and expressly rejected the reasoning of *Lansdown.*

Subsequent cases demonstrate the impracticability of cabining *Lansdown* and *Beckerman* to the precise facts there presented. In *United States v. Alessi I, supra,* this court found that the rationale of *Beckerman* necessarily comprehended a due process claim of failure "to fulfill an earlier promise not to prosecute" for other crimes made in consideration of a guilty plea. The opinion did not explain why the case stood differently from the immunity from prosecution promised in *Heike.* Perhaps the panel concluded that *Heike* had been eviscerated by *Cohen,* but Mr. Justice Harlan did not think so, even as late as *Parr v. United States, supra,* 351 U.S. at 517, 519, 76 S.Ct. 912. The further onrush of *Cohen* in the criminal area is illustrated by *United States v. MacDonald,* 531 F.2d 196 (4 Cir. 1976), where the *Lansdown* rationale was extend-

---

**10.** The *Lansdown* court did not say whether its decision would apply in another variation of double jeopardy, namely, a case where the de-

fendant claims but the prosecution denies that the second prosecution is for the same offense.

ed to a claim of denial of speedy trial.[11] Indeed if *Lansdown* were sound, why not? Here too the constitutional guarantee is not solely against conviction but against the trauma of having to await or undergo a trial long after arrest. See *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Yet the consistent practice in this circuit has been that denials of motions to dismiss indictments for lack of a speedy trial are reviewed on appeal from convictions, if these should occur.[12] We have little doubt that, as the Government argues, once *Cohen* is construed to have created a "right not to be tried" exception to the final decision rule in criminal cases, it will be hard to limit the claims for such review which counsel will advance.[13] This is not just an "alarming specter," as the Government put it in *Lansdown,* 460 F.2d at 172; in four short years the "specter" has acquired a number of earthly embodiments. If the point were open in this circuit, we would cast our lot in favor of the continuing vitality of *Heike v. United States, supra,* 217 U.S. 423, 30 S.Ct. 539, 54 L.Ed. 821, and the final decision rule in criminal cases as applied in the Fifth Circuit, and would dismiss this appeal for want of jurisdiction. However, we are constrained by contrary precedent in this circuit and, because of the possibility of a decision at the next term of the Supreme Court, will not seek *en banc* reconsideration.

11. Once again in *MacDonald,* as before in *Lansdown, supra,* 460 F.2d at 171 n.8, the Fourth Circuit panel characterized its holding as having a narrow effect, 531 F.2d at 199:

Not every speedy trial claim, however, merits an interlocutory appeal. Generally, this defense should be reviewed after final judgment. It is the extraordinary nature of MacDonald's case that persuaded us to allow an interlocutory appeal.

This would seem to us to be rather a reason for effecting pretrial review by mandamus; we find nothing in *Cohen* that conditions its applicability on the merit of a particular appeal.

12. Decisions such as *Lansdown, Beckerman, Alessi I* and *MacDonald* also raise the question whether a defendant *must* appeal within 10 days of the order by which he is aggrieved rather than await the outcome of the trial. See

## II. *The Merits*

Appellant's argument that this prosecution should be halted runs as follows: The terms of the plea bargain struck on August 18, 1972, covered defendant Alessi as well as defendant Papa. The bargain included, among other matters, an agreement not to prosecute, as a substantive crime, anything which could have been included as an overt act in the Eastern District conspiracy alleged in 72 Cr. 473. However, the argument runs, the conspiracy charged in the present Southern District indictment is the same conspiracy as that previously alleged in the Eastern District, and the substantive crimes with which appellant is taxed are "overt acts" or "pieces" of the Southern District conspiracy. Therefore the crimes presently charged fall within the scope of the bargain. Furthermore, appellant contends, the plea bargain, as here relevant, was intended to extend as far as the Southern District U.S. Attorney's Office, and, as a matter of law, the Eastern District had the power to bind the Southern District in this fashion even though no approval from the Southern District had been sought or received. Since Alessi's plea to the superseding information was intended to give him the same protection as if he had pleaded to the Eastern District indictment, and since he pleaded in reliance on the promises here sought to be enforced, appellant concludes that the present indictment, as to him, should be dismissed.[14]

Hart & Wechsler, *supra,* at 1554–1555, see also 629.

13. One that readily comes to mind is a claim of too speedy a trial, compare *Stans v. Gagliardi,* 485 F.2d 1290 (2 Cir. 1973). If an appeal lies from an order directing a trial for which a defendant has become unprepared because too much time has elapsed, why not from an order directing a trial for which the defendant has not had enough time to prepare? Why not also in the many cases where a defendant claims he is being unconstitutionally forced to trial in the absence of counsel of his own choosing?

14. Appellant's brief also raises a direct double jeopardy claim, although the point was not pressed at oral argument. The contention apparently is that Alessi is being charged as an aider and abettor not because he "actually knew of Manfredonia's subsequent transfers"

While not necessarily conceding the other matters, the Government, on appeal, has joined issue primarily on two of these points. The Government's main position is that the plea bargain should not be construed to prevent the Southern District U.S. Attorney's Office from prosecuting any crime, other than those that would fall under a double jeopardy ban, so long as the prosecution was independently developed. In the alternative, the Government contends that Druker could not, by his independent actions, bind the Southern District.

We find it unnecessary to go further than the terms of the bargain. In developing this, both sides rely almost entirely on the evidence introduced in a hearing held by the district court in *United States v. Papa, supra,* where two witnesses testified: Druker and one of Papa's attorneys. Indeed, the Government contends that the issue on the merits has already been decided by the interpretation of this evidence given in the *Papa* opinion, and cites the following language, 533 F.2d 815, at 824:

> The representations made by Druker related expressly and by necessary implication exclusively to Eastern District investigations and prosecutions. The terms of the bargain did not extend to matters under investigation elsewhere. Papa's attorneys' principal concern was to ensure that their client would not be re-indicted on "pieces" of the Eastern District conspiracy. Druker promised that the bargain immunized Papa from any further prosecution on the basis of any future information he received related to the Eastern District conspiracy. Papa's attorneys secured a promise from Druker

that there would be no additional prosecution stemming from matters presently under investigation in the Eastern District. Druker specifically refused to grant appellant *"carte blanche"* immunity as to all his past criminal conduct, and carefully noted that Papa was still subject to prosecution on any unrelated criminal activity. Never once was Druker asked to inquire about investigations in the Southern District nor was he asked to include Southern District crimes in the plea negotiations. Indeed, when Druker was queried by Papa's attorneys as to the money seized from Papa in February, 1972, he responded: "It's in the Southern District's bailiwick and I don't know what if anything they are going to do with it."

Appellant's counsel argues that, when read in context, this language does not settle the matter. Her contention is that Druker made two separate promises: first, "that there would be no additional prosecution stemming from matters presently under investigation in the Eastern District"; second, that Papa and Alessi "would not be re-indicted on 'pieces' of the Eastern District conspiracy." Only the first of these promises, it is claimed, was limited to prosecutions developed or carried out by the Eastern District; the second one, the promise applicable to this case, was intended to bind the Government as a whole. The *Papa* opinion, it is said, is not to the contrary because what was being decided was whether Ragusa, whose existence was known to Druker before the plea was entered, could subsequently be used as a witness in the Southern District trial for crimes arising from a distinct conspiracy, given that he had been located by means of

but because they were "the reasonably foreseeable consequences of his act"; that this theory of liability is the same as that used to hold a conspirator for the acts of his co-conspirators; and that, accordingly, on this view of intent aiding and abetting is the same crime as conspiracy. We have no need to consider the legal merits of this argument because the factual predicate is lacking. The Government states that it will prove that Alessi "knew some of Manfredonia's customers" and that Alessi had "a continuing, active stake" in the sales. The Government is, of course, quite right in stating

that appellant cannot assume that the evidence against him will be identical to that introduced against the already-tried defendants in *Iarossi.* The Government's offer of proof seems sufficient to support a conviction for aiding and abetting which is distinct from the crime of conspiracy, see, e. g., *United States v. Bommarito,* 524 F.2d 140, 145 (2 Cir. 1975). In any case it seems that if there is a question here, it is an issue whether the evidence will be sufficient to prove the crime charged—something which of course cannot now be considered—and not a matter of double jeopardy.

an independent investigation. As the court stated in the sentence immediately following the portion just quoted, "[a]lthough the Ragusa matter did not relate to a 'piece' of the Eastern District conspiracy, it did concern a matter under investigation in the Eastern District at the time the plea was entered."

While the quoted portions of the *Papa* opinion could be read in this fashion, we are not persuaded that they were so intended. The blanket statement that "[t]he representations made by Druker related expressly and by necessary implication exclusively to Eastern District investigations and prosecutions" is most naturally read as relating to the discussion of the entire consideration offered by Druker, including both of what appellant claims were two distinct promises. Insofar as the opinion does draw the distinction appellant wishes to make, it does not do so until after the whole bargain has been described and characterized. However, even though appellant's counsel indicated her desire, in the court below, to have Alessi's case await the results of the then-upcoming decision in *Papa,* we would not hold that opinion's construction of the bargain to be conclusive against appellant, were we not convinced that the underlying testimony supports the interpretation of the bargain for which the Government contends.

It is true that there are segments of Druker's testimony which, read in isolation, appear to support appellant's contention that one of the promises was not limited to Eastern District prosecutions. For example:

Q. [Papa's Attorney] So that Mr. Papa was promised as well, then, in return for his plea, overt acts in furtherance of this conspiracy would not give rise to subsequent individual prosecutions?

A. [Druker] That's correct.

Or, to be a bit more concrete, Druker said:

I advised, for example, that if somewhere down the chain of the ladder it turned out that Mr. Loria had been selling heroin to five or six people who were not named in my conspiracy but that it developed or became clear that this was as a result of the same chain from Mr. Papa on up, that he would be covered on this. Anything to do with that conspiracy.

However, in context these statements must fairly be read to delineate only the scope of the crimes covered. Druker never once directly testified that the promise or promises he had made were intended to cover any prosecution by other than the Eastern District Office; nor did Papa's attorney. To the contrary, Druker testified, as the *Papa* opinion points out, that he never checked with the Southern District as to their investigations; that he never asked the Southern District to join in the bargain; that he was never asked by Papa's lawyers to check with the Southern District; and that this was true even though Papa's attorneys had been told that the nearly $1 million seized from Papa at the time of his arrest in the Bronx was in the "Southern District's bailiwick" and, for all Druker knew, was the subject of investigation there. We can only conclude that insofar as the plea bargain can be understood to confer an immunity from narcotics law prosecutions greater than that given by the double jeopardy clause, it was not in the contemplation of either side that anyone outside of the Eastern District U.S. Attorney's or Strike Force Offices was bound. While this gave the defendants less than complete protection, their attorneys were doubtless more interested in nailing down the substantial concessions they had already achieved than in having further inquiry made. From Druker's point of view the limitation is certainly intelligible; he had good cause for not wanting to bind another Office which he had not consulted. We would, of course, have a different case if there were evidence to show that the Eastern District was attempting to evade its own obligations by transferring a prosecution across the East River; but there is none. Since we find nothing in this prosecution that offends the plea bargain, the order below is

Affirmed.

FEINBERG, Circuit Judge (concurring):

On the appealability issue, I concur in the result. On the merits, I join in the majority opinion.