certainly could have been. He had some hope that the prosecutors in Texas would consider the case concluded and go on to other business. In today's world of congested courts and heavy prosecutor case loads, this was not an unreasonable or illusory hope. The Texas prosecutors could easily have failed to go to the trouble of providing material to their colleagues in Tennessee. The Tennessee prosecutors might have decided that the defendants had already "been punished enough," and that they had bigger or other fish to fry in Tennessee. The whole case might have been lost in the shuffle in Texas before any other steps were taken. These were all possibilities that Randolph got the advantage of.

As events turned out, these advantages did not materialize, but when a defendant, in this case represented and fully advised by counsel, enters into a plea agreement, there is no requirement of either contract or constitutional law that a bargain based on contingent future events will turn out to his benefit. The court states, *supra* at 14, that Randolph had a "reasonable expectation that the plea agreement protected him from prosecution . . . both within [the Northern District of Texas] and in addition without that jurisdiction, unless founded on an investigation independent of that performed by the Texan authorities." But the record contains no support, other than Randolph's *post hoc* assertions, that he had such an expectation, and no support whatsoever for the idea that it was reasonable.

Finally, to the extent that this court should rule based solely on our view of the equity of the situation, Randolph does not deserve such a softening of the law. He, in effect, entered into the plea agreement with unclean hands, namely, the guilty knowledge that he was, in fact, a bigger fish than the Texas authorities took him for. It was primarily their realization of this concealment, and outrage over the leniency Randolph obtained for himself, that prompted them to exercise their right under the plea agreement and to contact the Tennessee authorities. I therefore respectfully **DISSENT**.

*RECOMMENDED FOR PARTIAL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0273P (6th Cir.)
File Name: 00a0273p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

     *v.*                           Nos. 98-5334/
                                    5335/6040/6049

MELVIN LEE RANDOLPH, JR.
(98-5334); ANGELA BALLARD
(98-5335); ANTHONY PETTIS
(98-6040); and CEDRIC
JOHNSON (98-6049),
     *Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 96-10060—James D. Todd, District Judge.

Argued and Submitted: January 26, 2000

Decided and Filed: August 17, 2000

Before: GUY, RYAN, and BOGGS, Circuit Judges.

———————

### COUNSEL

**ARGUED:** Richard H. Morgan, Jr., Pontiac, Michigan, M. Dianne Smothers, MUELLER & SMOTHERS, PLLC, Jackson, Tennessee, Michael L. Weinman, TATUM &

TATUM, Henderson, Tennessee, for Appellants. **ON BRIEF:** Richard H. Morgan, Jr., Pontiac, Michigan, M. Dianne Smothers, MUELLER & SMOTHERS, PLLC, Jackson, Tennessee, Michael L. Weinman, TATUM & TATUM, Henderson, Tennessee, Patrick F. Martin, HARDEE, MARTIN, JAYNES & IVY, P.A., Jackson, Tennessee, for Appellants. Jennifer L. Webber, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

RYAN, J., delivered the opinion of the court. GUY, J. (p. 18), delivered a separate concurring opinion. BOGGS, J. (pp. 19-20), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

RYAN, Circuit Judge. Defendants Melvin Lee Randolph, Jr., Angela Ballard, Anthony Pettis, and Cedric Johnson appeal from their convictions for conspiracy to possess with intent to distribute Schedule I and Schedule II narcotics, in violation of 21 U.S.C. § 841(a)(1). All four, among others, were alleged to be members of a conspiracy engaged in the transportation of cocaine powder, cocaine base, and marijuana between Dallas, Texas, and Jackson, Tennessee.

Randolph had previously been prosecuted in a federal district court in Texas for actions in furtherance of the same conspiracy; in that case he entered into a plea agreement with the government. He now claims the earlier plea agreement should have precluded his prosecution in Tennessee. In addition, Randolph asserts a double jeopardy claim and a claim of evidentiary error; Ballard argues numerous evidentiary, sentencing, and other errors; Pettis argues two sentencing errors; and Johnson argues both an evidentiary error and that the district court erred in denying his request for a special verdict.

_____

## CONCURRING IN PART, DISSENTING IN PART

_____

BOGGS, Circuit Judge, concurring in part and dissenting in part. I concur in all of Judge Ryan's opinion for the court, except its disposition of the prosecution of Randolph in Tennessee. The court is quite correct, *supra* at 9, when it states that "Randolph's 'ambiguity' argument is as unfocused as it is unpersuasive." The court then goes on to explain correctly how the plain language of Randolph's plea agreement means that the government did not violate the plea agreement when the United States Attorney in the Western District of Tennessee prosecuted Randolph, as he was fully free to do under the plea agreement. However, I disagree with the court's holding that "it is simply unfair" for such a prosecution to take place, when it is prompted by information furnished by the Texas authorities, or that such a determination of unfairness creates a binding rule of law, and I therefore dissent.

Rudyard Kipling captured the court's attitude perfectly in his poem, *Norman and Saxon*:

The Saxon is not like us Normans. He manners are not so polite.
But he never means anything serious till he talks about justice and right.
When he stands like an ox in the furrow with his sullen set eyes on your own,
And grumbles, "This isn't fair dealing," My son, leave the Saxon alone.

While this is generally an admirable sentiment, I think it is misapplied in this case.

To begin with, Randolph obviously did secure *some* benefit. He was not prosecuted further in Texas, when he

---

**CONCURRENCE**

---

GUY, Circuit Judge, concurring. I concur in the court's opinion, but write separately to make it clear that my concurrence in Part II.-A. is limited to the facts of this case. I would not want this case to be cited for the general proposition that a plea bargain in one district precludes prosecution in another district for related offenses.

For reasons we shall discuss, we will VACATE the conviction and sentence of Randolph, VACATE Johnson's sentence and REMAND his case for resentencing, and AFFIRM the convictions and sentences of Ballard and Pettis.

Because issues of precedential importance arise only with regard to defendants Randolph and Johnson, only their appeals will be addressed below. The appeals of defendants Ballard and Pettis will be addressed in an unpublished appendix to this opinion.

**I.**

Some time during or before early 1995, defendant Randolph moved from his home in Detroit, Michigan, to Dallas, Texas. Around August 1995, Randolph met Trent Brewer, apparently a large-scale drug dealer. From this meeting blossomed the drug conspiracy with which this case is concerned. Brewer would supply the drugs—mainly cocaine powder and cocaine base, but occasionally marijuana as well—and Randolph would provide the market, specifically connections to drug retailers in Jackson, Tennessee. Randolph's Tennessee connections were defendants Pettis and Johnson, who are cousins to Randolph's childhood friend and coconspirator Johnny Mack Bush.

The conspiracy involved, in addition to Brewer and Randolph in Texas and Bush, Pettis, and Johnson in Tennessee, at least the following individuals: defendant Ballard, Monica Michelle Infante, Rayola Burch, and James Johnson, all of whom were drivers or "mules" who transported drugs from Dallas to Jackson by automobile; and Foster Davis, Corrie Harbert, and Terrance Lott, underlings to Brewer in Dallas.

Trial testimony revealed that various of the "mules" made numerous trips from Dallas to Jackson, Tennessee, between August 1995 and April 1996 for the purpose of delivering

drugs. On each trip, between two and five kilograms of cocaine powder or cocaine base were transported.

The beginning of the end of this lucrative narcotics enterprise came during a March 27, 1996, "run" from Dallas to Jackson. According to Brewer's testimony, Brewer, Lott, Davis, and Harbert met Randolph, Bush, and Ballard in a Cracker Barrel restaurant in De Soto, Texas. Brewer's group arrived in Brewer's wife's Jaguar with three kilograms of cocaine powder and 0.863 kilograms of cocaine base, while Randolph, Bush, and Ballard arrived separately in two vehicles, Randolph's Suburban and Cadillac. The plan was for Ballard to drive the Jaguar with the narcotics to Jackson; for Randolph, Bush, Davis, and Harbert to follow Ballard in the Suburban; and for Brewer and Lott to return to Dallas in the Cadillac. Brewer and Lott left as planned, but very shortly after the journey began Ballard noticed that there were no insurance papers for the Jaguar and so balked at driving it further. The narcotics were then transferred to the Suburban, which Ballard would drive with Randolph as her passenger. Bush, Davis, and Harbert returned to Dallas in the Jaguar to exchange it for Randolph's Cadillac before resuming the drive to Jackson.

Shortly thereafter, the scheme came unraveled. The Suburban was stopped by state police officers near Sulphur Springs, Texas. The officers found the narcotics in the Suburban, and Randolph and Ballard were arrested on federal drug charges. Meanwhile, the Cadillac caught up with the Suburban and its occupants saw that Randolph and Ballard had been stopped. The police then stopped the Cadillac and searched it; when the search proved fruitless, the vehicle's occupants were released, whereupon they returned to Brewer's home in Dallas.

## A.

Randolph and Ballard were prosecuted in the United States District Court for the Eastern District of Texas. At that trial,

sentencing consequences, it, the government, must also seek a special verdict. However, nothing in *Dale* purports to bind future courts exclusively to the remedy granted in that case; that is, a remand giving the government the option to "permit" the defendant to be sentenced for the lesser penalty or force him to submit to a new trial. Johnson's prosecutors, unlike those of the *Dale* defendant, have already once declined to seek a special verdict after being placed on notice that Johnson intended to argue that he could be held responsible only for the less grave object of the conspiracy with which he was charged, and therefore it would be unjust to reward their efforts to sentence him improperly with another "bite at the apple" by providing them with a *Dale*-type election.

For these reasons, we will vacate the sentence imposed on Johnson and remand his case for resentencing with directions that he be sentenced for conspiracy to possess marijuana, the controlled substance carrying the more lenient statutorily prescribed sentence.

## III.

For the reasons described above, we **VACATE** the conviction and sentence of Randolph. We **AFFIRM** the conviction but **VACATE** the sentence of Johnson, and **REMAND** his case for the purpose of resentencing in accordance with the directions expressed in this opinion. Finally, we **AFFIRM** the convictions and sentences of Ballard and Pettis for the reasons described in the unpublished appendix to this opinion.

been found guilty of a marijuana-only conspiracy. 21 U.S.C. § 841(b)(1)(D). Nevertheless, Johnson's motion was denied and he received a sentence of 188 months.

This court has already had occasion to examine the situation in which a defendant is convicted under a general verdict for conspiracy to possess a controlled substance when more than one substance is involved and the substances involved carry different sentencing consequences. *See United States v. Dale*, 178 F.3d 429 (6th Cir. 1999). The Dale court held that it was "plain error" to impose on such a defendant a sentence which surpassed the maximum allowable for the object of the conspiracy carrying the least grave sentencing consequences. *Id.* at 433. Trial counsel for the *Dale* defendant had not formally objected to the general verdict used in that case and had not requested a special verdict; nonetheless, the court held that imposition of a sentence which surpassed the five-year statutory maximum for conspiracy to possess marijuana constituted a "manifest miscarriage of justice." *See* Fed. R. Crim. P. 52(b); *United States v. Cox*, 957 F.2d 264, 265 (6th Cir. 1992). Dale's case was remanded to the district court for a decision either to sentence Dale as though he had been convicted of a marijuana-only conspiracy or else to order a new trial, at the prosecution's election.

Johnson's situation differs from Dale's, of course, in that Johnson's counsel explicitly requested a special verdict on the question whether Johnson had conspired to distribute marijuana, cocaine, or both. Here, the trial judge and the government were on notice that Johnson wished to have the opportunity to convince a jury that his participation in the conspiracy related only to marijuana. By denying Johnson's request, the trial court effectively denied Johnson access to the jury with respect to this important question of fact.

Our decision in *Dale* makes clear that if the government seeks imposition of a sentence reflecting culpability for an object of a conspiracy carrying greater than the least grave

the district judge, in connection with his ruling in the defendants' motion to suppress, made the following findings of fact with regard to the Sulphur Springs stop and search of the Suburban.

Police officers in a marked police vehicle saw the defendants' "van" momentarily cross a lane marker, and thereupon pulled alongside the van to look at its occupants. When Randolph and Ballard failed to make eye contact with them, the officers pulled in front of the van and slowed to 30 miles per hour. The van moved to the left lane and proceeded at approximately 60 miles per hour. The police officers resumed highway speed and followed the van for some five miles. The officers reported witnessing at least one vehicle pass the van in the right lane; the posted speed limit was 70 miles per hour.

The officers pulled the van over for failure to maintain a lane and impeding traffic. Various colloquies occurred between the officers and the defendants, during which Randolph provided a false name and various false social security numbers before finally admitting his real name. The officers repeatedly asked for permission to search the defendants' vehicle, but both defendants refused. The defendants were held at the scene while an officer went to a district attorney's office in order to obtain a search warrant, but the warrant was refused on the ground that there was no probable cause to justify a search. Approximately one hour after the original stop, a drug-sniffing dog and its handler were brought to the scene. Soon thereafter it began to rain, and the whole cavalcade moved to the Sulphur Springs police station to continue the proceedings under a canopy. Randolph was arrested for falsely identifying himself to a police officer. The officers hoped the arrest would give them the right to search the van, but their hopes were dashed when the district attorney informed them that they would still need probable cause to search the vehicle. Finally, approximately one and one-half hours after the original stop occurred, the drug dog alerted to the van. The cocaine was quickly discovered, along

with a loaded handgun and a small amount of marijuana, apparently for the personal use of Randolph and Ballard during the long drive.

The district judge applied a *Terry v. Ohio*, 392 U.S. 1 (1968), analysis to the defendants' motion to suppress the evidence. This necessitated a two-step inquiry: first into the reasonableness of the initial stop, and then into the relatedness of the search to the initial stop's purpose.

The judge found that the "impeding traffic" justification was invalid because the presence of the van in the left lane, where it traveled at nearly the speed limit, was largely a result of the officers' own actions. He also held that the defendants' failure to make eye contact with the officers while driving on the highway could not be considered suspicious, and indeed should not even have been considered as an element in the "totality of the circumstances." However, he found that the "failure to maintain a lane" justification was sufficient to justify the initial stop.

However, the judge went on to hold that the permissible duration of a stop for a minor traffic offense is brief. A police officer is permitted to ask questions unrelated to the traffic stop, and these questions can form the basis for prolonging the stop's duration, but in this instance the matter of Randolph's identity and the question whether the van might have been stolen were completely settled at least 40 minutes before the dog alerted and provided probable cause for a search of the vehicle. The judge held that this was an unreasonable length of time, and consequently granted Randolph's and Ballard's motions to suppress the evidence of all events taking place after Randolph revealed his true identity. This included the discovery of the narcotics.

After the evidence from the Sulphur Springs stop was suppressed, Randolph entered into a plea agreement with the government, whereby he pleaded guilty to the lesser charge of using a telephonic device to facilitate a narcotics transaction

is that the widespread practice of offering witnesses sentencing leniency in the form of motions under Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure violates 18 U.S.C. § 201(c)(2), the federal antibribery statute. Because this view has been exploded even in the Tenth Circuit, we need not explore the argument in full.

*Singleton I* was reversed *en banc* in the Tenth Circuit, and the original *Singleton* holding was explicitly rejected in this circuit in *United States v. Ware*, 161 F.3d 414 (6th Cir. 1998), *cert. denied*, 526 U.S. 1045 (1999). The *Ware* court noted that "[t]he prosecutorial prerogative to recommend leniency in exchange for testimony dates back to the common law in England and has been recognized and approved by Congress, the courts, and the Sentencing Commission of the United States." *Id.* at 419.

The *Ware* court held that the word "Whoever" in Section 201(c)(2) does not apply to the government, and that the statute does not preclude a prosecutor from offering a cooperating defendant leniency in exchange for truthful testimony against another individual. *Id.* at 418-19. Therefore, this court will not disturb a challenged conviction on the ground that it was procured on the basis of testimony solicited by the government in exchange for promises of leniency in sentencing. *See id.* at 425.

This challenge is without merit.

### 2. Special Verdict Request

During proceedings below, Johnson requested that the district court submit a special verdict form to the jury, for the purpose of ascertaining whether Johnson was guilty of conspiracy to possess with intent to deliver *cocaine*, or whether his part in the conspiracy pertained merely to *marijuana*. The rationale for the request is that Johnson would have benefitted from a 60-month sentencing cap had he

constitutional guarantee of due process requires us to give weight to Randolph's reasonable expectation that the plea agreement protected him from prosecution for the conspiracy charge with which he was indicted in the Northern District of Texas, both within that jurisdiction as provided in the text of the plea agreement and in addition without that jurisdiction, unless founded on an investigation independent of that performed by the Texan authorities. But, as we know, the Tennessee authorities were entirely dependent upon the Texan investigation. Drug Enforcement Administration Agent Billy Joe Mundy, who ran the Tennessee investigation, testified that he knew nothing about the Dallas end of the conspiracy until DEA Agent Jeffrey Green, who ran the Texas investigation, told his office about it, which occurred after Randolph, Brewer, and others began to cooperate.

For these reasons, the exigencies of due process and the operation of the fundamental canons of contract construction compel us to the conclusion that Randolph's prosecution in Tennessee was entirely barred by the plea agreement he entered into in the Northern District of Texas. Having so held, we need not address Randolph's remaining arguments.

### B. Johnson

Johnson appeals on two grounds: (1) that the district court erred in admitting testimony procured by prosecutors in exchange for reductions or promises of reductions in terms of incarceration, in violation of 18 U.S.C. § 201(c); and (2) that the district court erred in denying his request for a special verdict. We will address these issues separately.

### 1. Federal Antibribery Statute

To support his first argument, Johnson relies on the Tenth Circuit's short-lived decision in *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998) (*Singleton I*), *rev'd en banc*, *United States v. Singleton*, 165 F.3d 1297 (10th Cir.), *cert. denied*, 119 S. Ct. 2371 (1999) (*Singleton II*). The argument

in violation of 21 U.S.C. § 843(b), and agreed to cooperate with the government's investigation. For its part, the government agreed to drop the charge of conspiracy to possess with the intent to deliver a Schedule II narcotic. The government also promised "not to further prosecute the defendant for any other offenses of which it may have knowledge prior to sentencing," but the same paragraph expressly limited the agreement to "the United States Attorney's Office for the Northern District of Texas and [did] not bind any other federal, state or local prosecuting authorities." In June 1996, Randolph received a sentence of 48 months' imprisonment, the maximum available for the charge to which he pleaded.

After Randolph complied with the terms of his plea agreement by providing the government with complete information as to his knowledge of the conspiracy and his role in it, the Texas prosecutors evidently felt Randolph was a "bigger fish" than they had theretofore suspected. They then contacted their counterparts in Tennessee, and provided them with all the information obtained as a result of the Texan investigation.

### B.

On November 18, 1996, the case now on appeal before this court began when Randolph, Pettis, Johnson, Bush, and Infante were indicted in the Western District of Tennessee. In August 1997, a superseding indictment charged Randolph, Ballard, Pettis, Johnson, Bush, Infante, and Burch with one count of conspiracy to possess with intent to distribute a Schedule I narcotic and one count of conspiracy with intent to distribute a Schedule II narcotic, both in violation of 21 U.S.C. § 841(a)(1). Pettis, Bush, and Burch all pleaded guilty. Infante absconded, and her whereabouts remain unknown. The remaining defendants went to trial.

Randolph's and Ballard's cases were severed from those of their codefendants and they were tried jointly, but separately

from their alleged coconspirators. Ballard filed a motion that her case be severed from Randolph's, but this motion was denied.

Johnson requested that a special verdict form be submitted to the jury to ascertain whether he was guilty of conspiring to possess cocaine, a Schedule I narcotic, or marijuana, a Schedule II narcotic. The district judge denied this request, stating that "there was one conspiracy . . . that on occasions resulted in the distribution of each of the three drugs alleged."

Randolph, Ballard, and Johnson were found guilty after a jury trial. Randolph received a sentence of 360 months, Ballard of 151 months, and Johnson of 188 months. Pettis received a sentence of 151 months after his guilty plea. All four defendants brought timely appeals.

## II.

### A. Randolph

Randolph brings three assignments of error: (1) that his prosecution in Tennessee was wrongful in that it should have been entirely barred by the plea agreement he entered into with the government in the Northern District of Texas; (2) that his prosecution in Tennessee violated the prohibition against double jeopardy in light of his previous prosecution in Texas; and (3) that the Tennessee district court erred in the degree to which it gave effect to the Texas district court's order that evidence from the Sulphur Springs traffic stop be suppressed. Because we agree with his first assignment of error—although not with all of the arguments he enlists in its support—we need not reach his second and third theories.

Randolph argues first, that the language of his plea agreement precludes his prosecution in Tennessee, because the language is ambiguous and therefore must be construed against the government. It is true, of course, that any ambiguities in the language of a plea agreement must be construed against the government. *See United States v.*

fundamental principles of constitutional fairness do not permit us to abide this patently unjust result.

A defendant in Randolph's position is entitled to presume that a plea agreement would confer *some* benefit on him. Even if the Northern District of Texas alone was bound by the agreement, such a defendant could reasonably infer that the results of the Northern District's prosecutors' investigation would not be handed over to prosecutors from other jurisdictions not bound by the agreement. This inference would hold true with regard only to offenses the Northern District of Texas prosecutors knew about at the time they entered into the agreement with Randolph; the Texas prosecutors would not, of course, be barred from sharing information with other jurisdictions concerning newly discovered offenses, just as they would not be barred from prosecuting Randolph themselves for offenses they learned of only after his cooperation with the government. Indeed, should this reasonable inference prove false, then the agreement Randolph entered into could provide no benefit but only detriment to the defendant, and is thus an unconscionable contract, and unenforceable.

The requirement that a defendant be afforded due process of law necessitates that Randolph's reasonable expectation of benefit from the plea agreement be respected, for it is a violation of due process to hold a defendant to an unconscionable agreement in the absence of proof of his *fully informed* consent to the risk that the bargained-away count of the indictment might return, like Hydra's head, the stronger for having been once cut off.

It is settled law that a plea agreement is unenforceable unless made knowingly and voluntarily. *See Mabry*, 467 U.S. at 509; *Santobello*, 404 U.S. at 261. Certainly Randolph was represented by counsel when he entered into this plea agreement; nonetheless we cannot say that he entered into it knowingly or voluntarily, since he was in no way informed as to the illusory nature of the government's promise. The

As interpreted by the district court for the Western District of Tennessee, the effect of the Texas agreement is that the government could bargain with Randolph, extract a benefit from the bargain, and then treat its own promise as illusory. For although Randolph pleaded guilty and cooperated in exchange for what he reasonably believed was immunity from prosecution for the conspiracy charge with which he had been indicted in Texas, in fact the agreement permitted the Texas prosecutors to pass their information to their Tennessee counterparts in order to bring the same conspiracy charge against him in a different courthouse. As far as Randolph was concerned, the result of entering the plea agreement in Texas and then being prosecuted in Tennessee was that the prosecutors in Tennessee had the additional *benefit* of Randolph's full cooperation, while Randolph had the additional *detriment* of the Texas guilty plea and conviction for the telephone charge in his criminal record, neither of which advantages the Texas prosecutors would have enjoyed had Randolph refused the bargain he was offered and chosen to go to trial.

In his Tennessee prosecution, Randolph's Texas conviction was used in the computation of his offense level for sentencing purposes; the amount of narcotics involved in the telephone offense was included at sentencing in Tennessee as being involved in a related offense. However, a rule which would permit federal prosecutors in a second jurisdiction to accept the fruits of an investigation performed in a first jurisdiction, without substantial investigation of their own and knowing that prosecution of a specific offense in the first jurisdiction—here, the conspiracy charge—was blocked by a plea agreement that the first jurisdiction's prosecutors were seeking to avoid, quite aside from being manifestly unfair, would allow the plea agreement to bring still further detriment to a defendant such as Randolph. It would permit use of the conviction for the charge pleaded to in the first jurisdiction—here, the telephone offense—to impeach the defendant's testimony at trial in the second case and to augment his criminal history at sentencing. The most

*Johnson*, 979 F.2d 396, 399 (6th Cir. 1992). But that does not lead us to the conclusion for which Randolph argues. The paragraph containing the government's promise, which Randolph claims is ambiguous, reads in full as follows:

> The Government agrees not to further prosecute the defendant for any other offenses of which it may have knowledge prior to sentencing. The government further agrees to dismiss the remaining counts of the indictment as to this defendant only at the time of sentencing. The government shall advise the court of the extent of **RANDOLPH**'s cooperation. Pursuant to § 1B1.8 of the United States Sentencing Guidelines, the government also agrees that any self-incriminating information provided pursuant to this agreement will not be used against the defendant in determining his applicable guideline range. This agreement is limited to the United States Attorney's Office for the Northern District of Texas and does not bind any other federal, state or local prosecuting authorities.

Randolph's "ambiguity" argument is as unfocused as it is unpersuasive. As we understand it, Randolph is saying that the language of the quoted portion of the agreement is ambiguous because the references to "the Government" and "the United States Attorney's Office" and, particularly, the manner in which the provisions of the agreement are sequenced, leave it unclear whether Randolph's "deal" is with the federal government generally or with the U.S. Attorney in the Northern District of Texas.

This imprecise language, Randolph argues, must be construed against the government and therefore in favor of Randolph's interpretation that the language of the agreement precluded the Tennessee federal court prosecution.

It is true that the United States Attorney's Office for the Northern District of Texas is referred to within the agreement as "the United States of America" and as "the Government,"

but this is a widespread and customary practice not calculated to give rise to confusion in a defendant represented by counsel. It is also true that the language limiting the effect of the plea agreement to the Northern District of Texas could have been better placed within the structure of the document, so as to be both more salient and more clear in its effect. Nevertheless, under any reasonable interpretation of the document as a whole, the limiting language can only be operative with regard to the totality of the agreement.

However, Randolph identifies an issue of much greater difficulty when he argues that whatever the technical niceties that govern the contractual meaning of the plea agreement language, it is simply unfair for the government to extract useful information and a guilty plea from Randolph in exchange for a promise not to prosecute him further, and then to do so anyway.

To be sure, "[p]lea agreements are contractual in nature. In interpreting and enforcing them, we are to use traditional principles of contract law." *United States v. Robison*, 924 F.2d 612, 613 (6th Cir. 1991). However, they are more than that. In *Santobello v. New York*, 404 U.S. 257, 261 (1971), the Supreme Court stated that the considerations justifying the practice of plea bargaining "presuppose fairness in securing agreement between an accused and a prosecutor"—a presupposition derived from the constitutional guarantee of due process. Furthermore, this court has stated:

Although plea agreements are contractual in nature, a defendant's underlying right of contract is constitutional, and therefore implicates concerns in addition to those pertaining to the formation and interpretation of commercial contracts between private parties. Therefore,

"[b]oth constitutional and supervisory concerns require holding the government to a greater degree of responsibility than the defendant (or possibly than would

be either of the parties to commercial contracts) for imprecisions or ambiguities in the plea agreements."

*Johnson*, 979 F.2d at 399 (citations omitted). Among the constitutional concerns referred to are those pertaining to the due process clause of the Fifth Amendment. The United States Supreme Court has stated that where the consensual nature of a plea agreement is called into question—where "the defendant was not fairly apprised of its consequences"—it can be attacked under the due process clause. *Mabry v. Johnson*, 467 U.S. 504, 508-09 (1984).

The plea agreement Randolph entered into in Texas was a contract without benefit or advantage to him—indeed, as we shall explain, it could only bring him detriment—and as such was offensive both to the fundamental common law canons of contract construction and to the constitutional guarantee of due process. In the agreement, Randolph promised both to plead guilty to the crime of using a telephonic device to facilitate a narcotics transaction and to "cooperate with the government, by giving truthful and complete information and or [sic] testimony concerning his participation in and knowledge of criminal activities," thereby saving the government time, money, and human resources, both judicial and investigative. In exchange for Randolph's promises, the government in the Northern District of Texas promised, among other things, "not to further prosecute the defendant for any other offenses of which it may have knowledge prior to sentencing," and "to dismiss the remaining counts of the indictment." There was no mention of the possibility that the Texas prosecutors would "silver platter" the results of their investigation—including information gleaned as a result of Randolph's extensive bargained-for cooperation—to prosecutors in another jurisdiction: thus supporting the prosecution of the defendant for an offense *identical* to the "remaining count[]" the Texas prosecutors had agreed to dismiss.