**UNITED STATES of America, Appellant,**

v.

**James M. GEBBIE, Midwest Presort Mailing Services, Inc., and James D. Richter**

**No. 01–1812.**

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 2001.

Filed: June 28, 2002.

Paul J. Brysh (Argued), Office of the United States Attorney, Pittsburgh, PA, Counsel for Appellant.

Michael R. Hamed (Argued), Messerman & Messerman, Cleveland, OH, Counsel for Appellee, James M. Gebbie.

J. Alan Johnson, Johnson & Eddy, Pittsburgh, PA, Counsel for Appellee, Midwest Presort.

Before: SLOVITER, NYGAARD, and AMBRO, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

We are asked to determine whether plea agreements between Appellees and the U.S. Attorneys for the Northern and Southern Districts of Ohio bar the present prosecution. Appellees pleaded guilty to misprision of felony in Ohio, and now the U.S. Attorney for the Western District of Pennsylvania is prosecuting Appellees for the felony that formed the basis of the misprision pleas. The District Court dismissed that count of Appellees' indictment, holding that it violated the Fifth Amendment's prohibition against being twice placed in jeopardy, and the Government appealed. We conclude that the District Court erred, but will affirm the dismissal because the plea agreements protect Appellees from prosecution in Pennsylvania for the same crimes and offenses that were charged against them in Ohio.

### I.

Appellee James Gebbie is the founder, president, and owner of Appellee Mid–West Presort Mailing Services, Inc. ("Midwest"). Midwest is headquartered in Cleveland, Ohio, and operates facilities in Pittsburgh, Syracuse, Akron, and Columbus. Appellee James Richter was the plant manager in Pittsburgh and the senior director of operations in Akron and Columbus. Midwest sorted and bar-coded mail for business customers seeking to obtain lower first-class letter rates for presorted and bar coded mail from the United States Postal Service. The rates for such mail depended upon the proportion of mail that was sorted and the extent of sorting.

Mail from certain business customers was given to Midwest with reduced rate postage already affixed. If Midwest was able to sort their mail more extensively than anticipated, the Postal Service paid Midwest a rebate. Conversely, if Midwest sorted their mail less extensively than anticipated, Midwest owed the Postal Service additional postage. The Postal Service checked only small samples of the presorted mail. Refunds and charges were based upon two forms submitted by Midwest: P.S. Form 3600, entitled "Mailing Statement," and P.S. Form 3533, entitled "Application and Voucher for Refund of Postage and Fees."

On March 18, 1999, a twenty-two-count indictment was returned in the Southern District of Ohio naming Gebbie, Richter, Midwest, and one other former Midwest employee as Defendants. Among other things, the Ohio Indictment alleged that all Defendants conspired to make false statements to the Postal Service between January 1, 1993 and August 31, 1994. The Ohio Indictment alleged that the conspiracy occurred in the Southern District of Ohio "and elsewhere."

Midwest pleaded guilty to Count Eighteen of the Ohio Indictment, which charged a conspiracy to make false statements in violation of 18 U.S.C. §§ 371, 1001. The remaining twenty-one counts in the Ohio Indictment against Midwest were dismissed. Gebbie and Richter pleaded guilty to a single count of misprision of a felony in violation of 18 U.S.C. § 4. This was pursuant to a plea agreement in which the Ohio Indictment was dismissed in its entirety and a Superseding Information alleging misprision was issued to replace it. The felony underlying the misprision charge was the same conspiracy to which Midwest had pleaded guilty, *i.e.*, "conspiracy to make false statements on Form 3600 mailing statements submitted to the United States Postal Service in 1993 and 1994." Appellees were then sentenced in the Southern District of Ohio.

Before the plea agreements in Ohio were finalized, the U.S. Attorney for the Southern District of Ohio and defense counsel learned that the U.S. Attorney for the Western District of Pennsylvania was investigating Defendants. They made an attempt to resolve all potential charges in a global agreement among the Northern District of Ohio, the Southern District of Ohio, the Western District of Pennsylvania, and Defendants, but the U.S. Attorney's Office for the Western District of Pennsylvania believed it was investigating crimes other than those committed in Ohio, so it declined to enter into an agreement.

A few months later, Gebbie, Richter, and Midwest were indicted in the Western District of Pennsylvania. That indictment was later replaced by an eight-count superseding indictment. Count One of the Pittsburgh Indictment charged Midwest, Gebbie, and Richter with a conspiracy,

from 1992 to 1995, to commit mail fraud by undercounting mail processed for Mellon Bank and then "hiding" the mail among other customers' mail. Defendants allegedly would submit P.S. Forms 3600 that understated Mellon Bank's mail and Forms 3533 that overstated the refunds to which Midwest was entitled. In that manner, they caused the Postal Service to issue refund checks that were inflated. Counts Two and Three charged all three Defendants with substantive mail fraud offenses. Counts Four through Eight charged all three Defendants with making false statements to a federal agency.

Defendants filed motions to dismiss on double jeopardy grounds, based upon the prior federal prosecution in the Southern District of Ohio. Midwest and Gebbie filed a joint motion to dismiss the conspiracy charge. Richter filed a separate motion to dismiss the conspiracy charge and the false statements charges. Defendants also moved to dismiss the Pittsburgh Indictment in its entirety on the basis of unconstitutional pre-indictment delay.

The District Court granted the motions to dismiss the conspiracy count, but denied Richter's motion to dismiss the substantive false statements counts. The court held that the mail fraud conspiracy charged in the Pittsburgh Indictment is the same offense as the false statements conspiracy to which Midwest had pleaded guilty in Ohio. The court also held that the misprision charge to which Gebbie and Richter had pleaded guilty in Ohio was a lesser-included offense of the conspiracy charge alleged in Count One of the Pittsburgh Indictment, and thus violated the Double Jeopardy Clause of the Fifth Amendment to the Constitution which "forbids successive prosecution and cumulative punishment for a greater and lesser included offense."[1]

---

1. The court did not specifically address the issue of unconstitutional pre-indictment de-

*Brown v. Ohio,* 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). The Government argues on appeal that the District Court's double jeopardy analysis is constitutionally infirm.

## II.

■ Because we decide this case based upon the plea agreements, we do not need to reach the constitutional issue. Nonetheless, we think it is instructive to briefly explain why the District Court erred by treating misprision of felony as a lesser-included offense of the mail fraud conspiracy. When determining whether one crime is a lesser-included offense of another, we apply the test set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The test is "whether each provision requires proof of an additional fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180.

■ The elements of misprision of felony under 18 U.S.C. § 4 are (1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify authorities; and (4) the defendant took steps to conceal the crime. *See United States v. Cefalu,* 85 F.3d 964, 969 (2d Cir.1996). The elements of conspiracy to commit mail fraud under 18 U.S.C. §§ 371, 1341 are (1) an agreement between two or more persons to commit mail fraud; (2) the defendant knowingly joined the conspiracy; and (3) one of the conspirators committed an overt act in furtherance of the conspiracy. *See United States v. Conley,* 37 F.3d 970, 976–77 (3d Cir.1994). Each requires proof of an additional fact

that the other does not. For example, misprision requires that the defendant took steps to conceal the crime. There is no analogous element in the mail fraud or conspiracy statutes. Likewise, conspiracy to commit mail fraud requires an agreement, whereas there is no analogous element in the misprision statute. Therefore, misprision of the felony of conspiracy is not a lesser-included offense of the conspiracy itself, and Appellees have not been twice placed in jeopardy for the same offense.

## III.

■ Gebbie and Richter also argue that their plea agreements in Ohio bar their prosecution in the Western District of Pennsylvania.[2] They argue that the Government cannot reindict them for the same conspiracy that it voluntarily dismissed in Ohio in exchange for their pleas to misprision. They point to the language in their plea agreements stating that their agreements were made "in exchange for the dismissal" of the conspiracy counts, and they contend that under contract principles as applied to plea agreements, the Government must live up to its side of the bargain. *See Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."). According to Gebbie and Richter, because they offered their pleas in exchange for dismissal of the conspiracy counts, the Government is precluded from prosecuting them again for the same conspiracy. "Whether the government's conduct violates the

---

lay, but did deny the motion "in all other respects." Given how we resolve the appeal, however, that presents no problem.

2. Gebbie and Richter offer several legal grounds upon which we could affirm the District Court's order. We only need to consider one of them because we find it convincing.

terms of the plea agreement is a question of law and our review is plenary." *United States v. Moscahlaidis*, 868 F.2d 1357, 1360 (3d Cir.1989).

### A.

Plea agreements are contractual in nature, so we begin our analysis as we would with any contract. We examine first the text of the contract, or, in this case, the language of the Ohio plea agreement. *See Moscahlaidis*, 868 F.2d at 1361 ("Although a plea agreement occurs in a criminal context, it remains contractual in nature and is to be analyzed under contract-law standards."). Gebbie and Richter argue that Paragraph 11 of their Ohio plea agreements forbids the Government from prosecuting them for the same crime that was dismissed in Ohio, but the Government argues Gebbie's Paragraph 5 and Richter's Paragraph 6 make clear that only the U.S. Attorneys for the Northern and Southern Districts of Ohio agreed not to prosecute further.

Gebbie's Paragraph 5 states:

If such plea of guilty is entered, and not withdrawn, and defendant JAMES GEBBIE acts in accordance with all other terms of this agreement, the United States Attorney for the Southern District of Ohio agrees to seek leave of Court at the time of sentencing to dismiss Counts One through Eighteen of the Indictment and the United States Attorneys for the Southern and Northern Districts agree not to file additional criminal or civil charges against defendant JAMES GEBBIE based on his activities charged in the Superseding Information or the original Indictment herein or based on other similar activities in the Southern or Northern Districts of Ohio occurring prior to the dates set forth in the Superseding Information or Indictment.

And Gebbie's Paragraph 11 states:

Defendant JAMES GEBBIE understands that this agreement does not protect him from prosecution for perjury, should defendant JAMES GEBBIE testify untruthfully, or for making false statements, nor does it protect him from prosecution for other crimes or offenses which the United States discovers by independent investigation. Further, should Defendant JAMES GEBBIE fail to comply fully with the terms and conditions set forth herein, or should he fail to appear as required for sentencing, this agreement is voidable at the election of the government, in which case defendant JAMES GEBBIE shall be subject to prosecution as if the agreement had never been made.

Similarly, Richter's Paragraph 6 states:

If such plea of guilty is entered, and not withdrawn, and defendant JAMES RICHTER acts in accordance with all other terms of this agreement, the United States Attorneys for the Northern and Southern Districts of Ohio agree not to file additional criminal charges against defendant JAMES RICHTER based on his activities charged in the Superseding Information or the indictment herein, or based on other similar activities in the Northern or Southern Districts of Ohio occurring prior to the dates set forth in the Superseding Information or Indictment and as to which Defendant gives testimony or makes sworn or unsworn statements pursuant to this agreement.

And Richter's Paragraph 11 states:

Defendant JAMES RICHTER understands that this agreement does not protect him from prosecution for perjury, should defendant JAMES RICHTER testify untruthfully, or for making false

statements, nor does it protect him from prosecution for other crimes or offenses which the United States discovers by independent investigation. Further, should Defendant JAMES RICHTER fail to comply fully with the terms and conditions set forth herein, or should he fail to appear as required for sentencing, this agreement is voidable at the election of the government, in which case defendant JAMES RICHTER shall be subject to prosecution as if the agreement had never been made.

There is some tension between these paragraphs. Paragraphs 5 and 6 say that "the United States Attorneys for the Northern and Southern Districts of Ohio agree not to file additional criminal charges against" Gebbie and Richter. It sounds as if only those two U.S. Attorneys are bound. But Paragraph 11 refers not to specific U.S. Attorneys, but to "the United States." As we will explain, if the reference to "the United States" means only the U.S. Attorneys involved in the plea, then there is no conflict between these paragraphs. But, if the reference to "the United States" means all U.S. Attorneys, then the plea agreement as a whole is ambiguous as to whether it permits the present prosecution to go forward.

Before considering what "the United States" means, we must explain why Paragraph 11 has the possibility of foreclosing the present prosecution. Paragraph 11 makes clear that the Ohio plea agreements do not protect Gebbie and Richter from further prosecution if they commit perjury or "for other crimes or offenses which the United States discovers by independent investigation." This means that Gebbie and Richter can be prosecuted for crimes and offenses *that were not part* of the Ohio plea agreements. But in this case, the District Court found, and the Government concedes, that the conspiracy alleged in Pennsylvania is the same conspiracy as the one alleged in Ohio. Therefore, the United States Attorney for the Western District of Pennsylvania is attempting to prosecute Gebbie and Richter for the *same* crimes and offenses that were at issue in Ohio. While the Ohio plea agreements permit the Government to prosecute Gebbie and Richter "for *other* crimes or offenses," they do not permit the Government to prosecute Gebbie and Richter for the *same* crimes or offenses. The question, then, is *who* is bound when a plea agreement refers to "the United States" or "the Government"?

**B.**

We have touched upon a related issue before. In *United States v. Igbonwa,* 120 F.3d 437 (3d Cir.1997), we were asked to decide whether a promise made by a United States Attorney or his assistant would be binding on another agency—the INS—without the agency's explicit authority to bind it. There, we recognized a split among other circuits, and we adopted the reasoning of those courts holding that a United States Attorney cannot bind the INS without explicit authority from the INS. *Id.* at 444. We thought that "[t]o hold otherwise would grant United States Attorneys the power to bind any and every governmental agency under the supervision of the Attorney General through promises made in the plea agreement." *Id.* Although there are some surface similarities between *Igbonwa* and this case, *Igbonwa* is not dispositive. We are not asked to determine whether the promises of a U.S. Attorney are binding on the INS, DEA, or "every governmental agency under the supervision of the Attorney General." The question here is more circumscribed. We must determine whether promises made on behalf of "the Government" or "the United States" by a United

States Attorney to a defendant bind other United States Attorneys with respect to the same defendant.

 Courts of appeals are split on this issue. The Second Circuit has found that when a United States Attorney uses a term like "the Government," he binds only that specific district, "unless it affirmatively appears that the agreement contemplates a broader restriction."[3] *United States v. Annabi*, 771 F.2d 670, 672 (2d Cir.1985); *see also United States v. Abbamonte*, 759 F.2d 1065 (2d Cir.1985), overruled on other grounds by *United States v. Macchia*, 41 F.3d 35 (2d Cir.1994); *United States v. Alessi*, 544 F.2d 1139 (2d Cir. 1976), overruled on other grounds by *United States v. Macchia*, 41 F.3d 35 (2d Cir. 1994). But the Fourth Circuit holds that a U.S. Attorney's use of terms like "the Government" or "the United States" bind all other United States Attorneys, unless there is an express limitation to the contrary. *See United States v. Harvey*, 791 F.2d 294 (4th Cir.1986); *United States v. Carter*, 454 F.2d 426. Thus, the Second and Fourth Circuits employ opposite default rules.

The Second Circuit explained its rule in *United States v. Annabi*, but, interestingly, also noted its illogical posture:

> As an original proposition, a plea agreement whereby a federal prosecutor agrees that "the Government" will dismiss counts of an indictment other than the ones to which guilty pleas are entered might be thought to bar the United States from reprosecuting the dismissed charges in any judicial district unless the agreement expressly limits the scope of the agreement to the district in which the dismissed charges are

initially brought. However, the law has evolved to the contrary. A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction. *United States v. Abbamonte, supra,* 759 F.2d [1065 (2d Cir.1985)] at 1072; *United States v. Alessi,* 544 F.2d 1139, 1154 (2d Cir.[1976]), *cert. denied,* 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976); *see also United States v. Papa,* 533 F.2d 815, 823025 (2d Cir.[1976]), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976).

*Annabi,* 771 F.2d at 670. Working back through the three cases cited in *Annabi,* we are unable to discern a sound basis for the rule. How the rule "has evolved to the contrary" shows that it really has no analytically sound foundation. It just keeps replicating itself each time it is cited.

The first case cited in *Annabi* is *Abbamonte,* but *Abbamonte* merely relies upon the other two cases cited in *Annabi*— *Alessi* and *Papa*—for the proposition that there must be an indication that a plea agreement contemplates a broader restriction for it to be binding on other districts. The court in *Abbamonte* offers no further justification for the rule.

The court in *Alessi* relies upon *Papa,* which is a related case. The district court in *Papa* had held an evidentiary hearing into the meaning and scope of a plea agreement between the Government and Papa, and now in *Alessi,* one of Papa's co-conspirators alleged that Papa's plea agreement also covered him. Because the court in *Alessi* was construing the same

---

**3.** The Second Circuit has held that "an affirmative appearance need not be an express statement." *United States v. Russo,* 801 F.2d 624, 626 (2d Cir.1986). Thus, "a promise to bind other districts can be inferred from the negotiations between defendant and prosecutor, as well as from statements at the plea colloquy." *Id.* (citations omitted).

plea agreement as was the court in *Papa*, it makes sense that *Alessi* relied upon *Papa*.

*Papa*, however, provides no support for the rule the Second Circuit follows. Although the issue in *Papa* was whether a promise made in the Eastern District of New York was binding upon the Southern District of New York, the court expressly stated that "[t]he question here does not, as appellant suggests, concern the breadth of the respect that principles of due process require one district of the United States Attorneys' Office to accord promises made by a Strike Force Attorney in another district." *Papa*, 533 F.2d at 824. The district court held an evidentiary hearing into the meaning of the plea agreement, and the Second Circuit agreed that "[t]he representations made by [the United States Attorney] related expressly and by necessary implication exclusively to Eastern District investigations and prosecutions." *Id.* at 824.

Although *Papa* held that the plea agreement did not bind other districts *because the evidence revealed an intent to bind only one district*, the Second Circuit apparently has broadly interpreted this case as meaning that plea agreements do not bind other districts absent an affirmative appearance of doing so. *Papa* does not explain or attempt to rationalize the rule that has evolved.

In contrast to the Second Circuit, the Fourth Circuit holds that "the Government" means the *whole* Government, thus all U.S. Attorneys. In *United States v. Carter*, the question arose whether the U.S. Attorney for the District of Columbia might bind the U.S. Attorney for the Eastern District of Virginia. *Carter*, 454 F.2d at 427. The defendant alleged that such a promise had been made, and the Fourth Circuit concluded that the defendant was entitled to an evidentiary hearing to deter-

mine the existence and scope of the promise. *Id.* In finding that one U.S. Attorney could indeed bind another, the Fourth Circuit used language so eloquent, and of such sound logic, that we quote it here to give it its full effect:

The United States government is the United States government throughout all of the states and districts. If the United States government in the District of Columbia, acting through one of its apparently authorized agents, promised that the sole prosecution against defendant would be the misdemeanor charge in that jurisdiction, and defendant relied on the promise to his prejudice—facts which must be proved in the plenary hearing if the indictment is to be dismissed—we will not permit the United States government in the Eastern District of Virginia to breach the promise.

Sound reasons of public policy support this result. Many federal crimes have multistate ramifications and are committed by persons acting in concert. If we hypothesize a single defendant charged with the interstate transportation of a stolen motor vehicle through several states, we would not question that the efficient administration of justice would support the authority of the prosecutor in one of those states to obtain an indictment and bargain for a guilty plea, agreeing that all offenses in the other jurisdictions would be disposed of in the single case. If there is added to the hypothetical codefendants and, if the plea bargain includes a promise of cooperation in their disclosure and/or their prosecution, the desirability of the result we reach becomes more apparent. A contrary result would constitute a strong deterrent to the willingness of defendants accused of multistate crimes to cooperate in speedy disposition of their

cases and in apprehending and prosecuting codefendants.

If there be fear that an United States Attorney may unreasonably bargain away the government's right and duty to prosecute, the solution lies in the administrative controls which the Attorney General of the United States may promulgate to regulate and control the conduct of cases by the United States Attorneys and their assistants. The solution does not lie in formalisms about the express, implied or apparent authority of one United States Attorney, or his representative, to bind another United States Attorney and thus to visit a sixteen year sentence on a defendant in violation of a bargain he fully performed. There is more at stake than just the liberty of this defendant. At stake is the honor of the government[,] public confidence in the fair administration of justice, and the efficient administration of justice in a federal scheme of government.

*Carter*, 454 F.2d at 428.

The Fourth Circuit later relied upon Carter in interpreting the plea agreement at issue in *United States v. Harvey*, 791 F.2d 294 (4th Cir.1986). In *Harvey*, the defendant entered into a plea agreement in the Eastern District of Virginia which stated, in part:

> Should the Court accept the defendant's plea of guilty ... the Government will move to dismiss the remaining counts of the indictment ... The Eastern District of Virginia further agrees not to prosecute MICHAEL LEE HARVEY for any other possible violations of criminal law arising from the offenses set out in the indictment or the investigation giving rise to those charges. It is also a part of this plea agreement that the Government will not oppose a continuation of the defendant's bond pending his sen-

tencing ... The Government also will not oppose the defendant's [sentencing request].

*Harvey*, 791 F.2d at 296 n. 1. Harvey was subsequently indicted in the District of South Carolina. He moved in the Eastern District of Virginia to enjoin the South Carolina prosecution on the basis of his plea agreement in Virginia.

The Fourth Circuit determined, first, that the reference to "the Eastern District of Virginia" in the plea agreement was ambiguous. *Id.* at 301. The court noted that most of the plea agreement referred to "the United States" rather than the specific U.S. Attorney's Office, so it posited that the reference to "the Eastern District of Virginia" may have been "merely a careless imprecision." *Id.* It also noted that the background law in the Fourth Circuit is Carter's holding that "though the Government negotiates its plea agreements through the agency of specific United States Attorneys—as necessarily it must—the agreements reached are those of the Government." *Id.* at 302–03. The court concluded that the plea agreement was ambiguous, construed the ambiguity against the Government, and held "that [the plea agreement] must be interpreted to prevent further prosecutions for such offenses anywhere and by any agency of Government." *Id.* at 303.

After considering these various approaches to construing terms like "the Government" and "the United States," we find the reasoning underlying the Fourth Circuit's approach more persuasive. We do not go as far as the Fourth Circuit, which seems willing to hold that the *entire* Government is bound by a U.S. Attorney's promise. Indeed, our decision in *Igbonwa* would not allow it. We only need to decide whether a U.S. Attorney's use of terms like "the United States" and "the

Government" binds his fellow U.S. Attorneys. We conclude that it does.

■ We hold, therefore, that when a United States Attorney negotiates and contracts on behalf of "the United States" or "the Government" in a plea agreement for specific crimes, that attorney speaks for and binds all of his or her fellow United States Attorneys with respect to those same crimes and those same defendants. We are not convinced, as the U.S. Attorney argues, that each district should always be a separate contracting entity. United States Attorneys should not be viewed as sovereigns of autonomous fiefdoms.[4] They represent the United States, and their promises on behalf of the Government must bind each other absent express contractual limitations or disavowals to the contrary.

## C.

This conclusion, however, does not completely resolve the issue on appeal. As we stated at the outset, our inquiry into the meaning of "the United States" is relevant to determining whether the plea agreements in their entirety prevent the current prosecution from going forward. We said that if "the United States" refers only to the U.S. Attorneys involved in negotiating the plea, then there would be no tension between Paragraph 5 and Paragraph 11.[5] Both paragraphs would reinforce each other. But if "the United States" refers to *all* U.S. Attorneys, then Paragraphs 5 and 11 conflict. Because we now hold that terms like "the United States" and "the Government" do indeed refer to all U.S. Attorneys, we find that Paragraphs 5 and 11 are in tension with each other, and the plea agreements are, therefore, ambiguous on the question of whether they permit the present prosecution to proceed.

The text of the agreements themselves does nothing to clear up this ambiguity. At times, the contracting party is referred to as "the United States."[6] Sometimes, the contracting party is called "the government."[7] Yet other times, the contracting

4. We are convinced that the U.S. Attorney's Office for the Western District of Pennsylvania honestly believed that it was investigating "other crimes" when it declined to specifically join this agreement. We are likewise convinced that, in an accusatorial system such as ours, defendants whose crimes may potentially implicate other districts should not have to depend upon the integrity of remote U.S. Attorneys when negotiating their pleas. Mischief happens. If the plea agreement is to bind no other U.S. Attorney and no other district, a provision saying so is easily inserted, and every party is thus protected.

5. For Richter, the relevant paragraphs are Paragraph 6 and Paragraph 11.

6. Using Gebbie's plea agreement as an example: The opening paragraph of the plea agreement identifies the plaintiff as the "United States of America." The fourth paragraph warns that sentencing estimates that Gebbie may have received from "the United States" are not binding on "the United States," and

that "[t]he United States makes no promise or representation concerning what sentence the defendant will receive." The seventh paragraph states that "Gebbie and the United States agree that he will make restitution." Three subparts to the seventh paragraph similarly refer to "the United States," including Paragraph 7.5 which says "the United States may withdraw its offer of a plea" if the court's order of restitution and fines is less than $200,000. The eighth paragraph refers to an agreement made between Gebbie and "the United States." The tenth paragraph refers to the sentence recommendation which "the United States" will make. And the eleventh paragraph states that the plea agreement does not protect Gebbie "from prosecution for other crimes or offenses which the United States discovers by independent investigation."

7. The eleventh paragraph makes the plea agreement "voidable at the election of the government" if Gebbie fails to comply with its terms and conditions.

party is identified as the United States Attorneys for the Southern and Northern Districts of Ohio.[8] Finally, the ninth paragraph contains a mysterious reference to "The United States Attorney" without identifying which United States Attorney is being discussed.

This imprecise drafting and interchanging of terms makes it difficult to determine precisely who promised what. And it further compounds the ambiguity caused by Paragraphs 5 and 6's references to the specific U.S. Attorneys and Paragraph 11's reference to "the United States."

■ Because we apply rules of contract interpretation to plea agreements, the first step is to decide whether the plea agreement is ambiguous or unambiguous. "A contract is ambiguous if it is capable of more than one reasonable interpretation." *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir.1999). As we have already concluded, the agreements are ambiguous because, while Paragraphs 5 and 6 indicate only the U.S. Attorneys for the Southern and Northern Districts of Ohio are bound, Paragraph 11 indicates that all U.S. Attorneys are bound. The plea agreements are capable of two reasonable interpretations.

■ So, faced with an ambiguous plea agreement, we must look to extrinsic evidence that may evince the parties' intent. *See United States v. Clark*, 218 F.3d 1092, 1095 (9th Cir.2000) ("If, however, a term of a plea agreement is not clear on its face, we look to the facts of the case to determine what the parties reasonably understood to be the terms of the agreement."), *cert. denied,* 531 U.S. 1057, 121 S.Ct. 668, 148 L.Ed.2d 569 (2000). The most relevant piece of extrinsic evidence that, on first glance, seems to weigh in the Government's favor is that the United States Attorney for the Western District of Pennsylvania was invited to join in the Ohio plea agreements, but declined. As the U.S. Attorney for the Western District of Pennsylvania argued below, and candidly admits on appeal, the Western District believed it was going to prosecute Gebbie and Richter for *different* crimes than the ones that were at issue in Ohio. So did Gebbie and Richter. Had that happened, then Gebbie's and Richter's argument based on Paragraph 11 of their plea agreements would fail because the Western District would be prosecuting them for "other crimes and offenses," which are clearly exempted from the plea agreements' purview. But that is not what happened. Instead, as found by the District Court, and conceded by the Government on appeal, the Western District of Pennsylvania ended up prosecuting Gebbie and Richter for the *same* crimes and offenses that had been at issue in Ohio, and this renders the Western District's non-participation in the Ohio plea agreement irrelevant because its decision was based on facts that simply do not exist. Thus, the extrinsic evidence actually compounds the ambiguity.

■ When we interpret ambiguous plea agreements and extrinsic evidence

---

**8.** The fifth paragraph states that "the United States Attorney for the Southern District of Ohio agrees to seek leave of Court" for dismissal of Counts One through Eighteen of the Indictment, and that "the United States Attorneys for the Southern and Northern Districts agree not to file additional criminal or civil charges against defendant James Gebbie based on his activities charged in the Superseding Information or the original Indictment herein or based on other similar activi-

ties in the Southern or Northern Districts of Ohio occurring prior to the dates set forth in the Superseding Information or Indictment." The twelfth paragraph also states that if the Court refuses to accept any binding provision of the plea agreement, and Gebbie withdraws his guilty plea, then "the United States Attorneys for the Southern and Northern Districts of Ohio may proceed with prosecution of the conduct set forth in the Superseding Information and/or Indictment without prejudice."

does not resolve the ambiguity, then we construe the ambiguity against the drafter. Because of the Government's advantage in bargaining power, we, and numerous other courts of appeals, construe ambiguities in plea agreements against the Government. *See United States v. Baird*, 218 F.3d 221, 229 (3d Cir.2000) ("In view of the government's tremendous bargaining power, we will strictly construe the text against it when it has drafted the agreement."); *United States v. Difeaux*, 163 F.3d 725, 728 (2d Cir.1998) ("[T]he reviewing court must ... construe ambiguous provisions against the government, which drafted the agreement and enjoys unequal bargaining power in the sentencing process."); *United States v. Harvey*, 791 F.2d 294, 303 (4th Cir.1986) ("Having concluded that the disputed provision was ambiguous in the respect found dispositive by the district court, we further conclude that under the plea bargaining principles above stated the provision must be read against the Government."); *United States v. Randolph*, 230 F.3d 243, 248 (6th Cir.2000) ("It is true, of course, that any ambiguities in the language of a plea agreement must be construed against the government."); *Margalli–Olvera v. INS*, 43 F.3d 345, 353 (8th Cir.1994) ("Where a plea agreement is ambiguous, the ambiguities are construed against the government."); *United States v. Anderson*, 970 F.2d 602, 607 (9th Cir. 1992) (The government "ordinarily must bear responsibility for any lack of clarity."), *as amended by* 990 F.2d 1163 (9th Cir.1993); *United States v. Jefferies*, 908 F.2d 1520, 1523 (11th Cir.1990) ("Finally, a plea agreement that is ambiguous 'must be read against the government.' "). *See also* Restatement (Second) of Contracts, § 206 ("In choosing among the reasonable meanings of a promise or agreement or a term

thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").

Applying that principle, we will construe the ambiguity against the Government and hold that Paragraph 11 of Gebbie's and Richter's plea agreements bars the United States Attorney for the Western District of Pennsylvania from prosecuting Gebbie and Richter for the same crimes and offenses that were at issue in the Ohio plea agreements.

## IV.

In sum, and for the reasons given above, we will affirm the District Court's order.